IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

**FILED**

NOV 2 0 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

'09 CV 2 62 8   L      BLM

United States of America, ex rel. Kelvin
Carlisle

     Relators/Qui tam Plaintiffs


  Vs.


Pacific Ambulance
3944 Murphy Canyon Rd #C-108
San Diego, CA 92123
 Reg. Agent:  Raymond Iskander
22541 Aspan St Suite E
Lake Forest, CA 92630

San Diego Medical Services Enterprise,
LLC
10405 San Diego Mission Rd  #200
San Diego, CA 92108
  Reg. Agent:  Philipp Forgione
  1010 Second Ave, Ste 400
  San Diego, CA  92101

Rural/Metro Corporation dba
Rural/Metro of California, Inc.
Rural/Metro of San Diego, Inc.
10405 San Diego Mission Rd  #100
San Diego, CA 92108
Agent –CT Corporation System
818 West Seventh St.
Los Angeles, CA 90017
Sottek Trippe Enterprise, LLC dba

**TO BE FILED IN CAMERA**

**AND UNDER SEAL**



1

Air Care International
1603 Avocado Rd.
Oceanside, CA 92054
Reg Agent – Cory Sottek
1603 Avocado Rd.
Oceanside, CA 92054


Americare Medservices Inc.,
10730 Thornmint Rd
San Diego, CA 92127
  Reg Agent:  Scott Smith
  1059 E. Bedmar St.
  Carson, CA  90746

Alert Ambulance Network LLC
3585 Hancock St  #200-B
San Diego, CA 92110
  Reg AgentBurleigh Wright
3585 Hancock St #200-B
  San Diego, CA  92110

Balboa Ambulance, Inc.
1138 Broadway
El Cajon, CA 92021
  Reg Agent:  John Olson
  6483 Dwane Ave
  San Diego, CA  92120

E R Ambulance
9640-B Mission Gorge Rd #338
Santee, CA 92071
  Reg Agent:  Rafael Silva
  9640-B Mission Gorge Rd. # 338
  Santee CA  92071


Medfleet Ambulance Service, Inc.
San Diego, CA 92110
  Reg Agent:  Gregory L. Gibson
  3749 Kurtz St.
  San Diego, CA  92110

Bowers Companies, Inc. dba Bowers
Ambulance
3355 E. Spring St. #301
Long Beach, CA 90806
Reg Agent:  Raymond Iskander

Care Ambulance Service, Inc.
1517 W. Braden Ct.
Orange, CA 92868
Res Agent: Rick Richardson

County Rescue, Inc. dba County Rescue
Ambulance and CRA Ambulance
2434 E. Fender Ave. #G
Fullerton, CA 92831
Res Agent: Bartlett Cramwell
4585 Wade Avenue
Perris, CA 92571

Enova Medical Response, Inc.
19236 Victory Blvd.
Tarzana, CA 91335
Res Agent: Gagik Papoyan

Lifeline Emergency Response System,
Inc.
242 California Court
Mission Viejo, CA 92692
Res Agent: Heidi M. Lopez

Filyn Corporation dba Lynch Ambulance
2950 La Jolla Street
Anaheim, CA 92806
Res Agent: Walt Lynch
5621 Foxmills Ave.
Buena Park, CA 90621

Medcoast Medservices, Inc.
14325 Iseli Road
Santa Fe Springs, CA 90670
Res Agent: James L. Twaddell

Trans-Aid, Inc.
1300 Gardena Avenue
Glendale, CA 91204
Res Agent: Armen Abassian

## <u>QUI TAM RELATORS COMPLAINT UNDER 31 U.S.C. § 3729, FEDERAL FALSE CLAIMS ACT</u>

Comes Now Relator, by and through his counsel of record, and for his cause of action against the defendants states to the Court as follows:

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising out of the false claims presented for payment by the defendants under the Federal Medicare Program.  This action arises under the provisions of Title 31 U.S.C. § 3729, et seq, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under that Act.

2.      Section 3732(a) of the Act provides that "Any action under section 3730 may be brought in any judicial district in which the defendant or,

4

in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

3.      Defendant Pacific Ambulance is a California Corporation with its principal place of business located at 22541 Aspan Street # E, Lake Forest, CA, 92630.  It conducts business in the Southern District of California and is amenable to service of process in this judicial district, and venue is therefore proper in this judicial district.

4.      Under the terms of the Act, this complaint "shall be filed in camera and under seal," 31 USC § 3730, and is to remain under seal for a period of at least sixty days and shall not be served on the defendants until the Court so orders.  31 USC § 3730.  The Government may elect to intervene and proceed with the action within the sixty day time frame after it receives both the complaint and the material evidence submitted to it.

**PARTIES TO THE ACTION**

5.      Relator and Qui Tam Plaintiff Kelvin Carlisle, is a citizen and resident of Nevada who owns and operates ambulance companies in San Diego, Orange, and Los Angeles counties and brings this action on behalf of

the United States Government, and will hereinafter be referred to as "Relator."

6.     Defendant Pacific Ambulance is a California Corporation with its principal place of business at 22541 Aspan Street #E, Lake Forest, CA, 92630.  Its President is Brian Cates. His partner, Raymond Iskander is its registered agent for service of process.  Pacific Ambulance may be served with process at 22541 Aspan Street #E, Lake Forest, CA 92630.

7.     Defendant San Diego Medical Services Enterprise, LLC is an active California LLC in good standing whose registered agent is Phillip Forgione.  The registered agent can be served with process at 1010 Second Ave Ste 400, San Diego, CA 92101.  On information and believe San Diego Medical Services Enterprise, LLC, may be doing business as Rural Metro in the San Diego area.

8.     Defendant Rural/Metro Corporation is a 50% member of the San Diego Medical Services Enterprise LLC and is also a Medicare provider as a separate entity. It is a Medicare provider under the cover of several corporate structures in California including Rural/Metro of San Diego, Inc. The registered agent can be served at CT Corporation   818 W. Seventh St.  Los Angeles, CA 90017.  Rural Metro is currently under a Corporate Integrity Agreement.

9.     Defendant Sottek Trippe Enterprise, LLC dba Air Care International Ground Transportation Division is an active California LLC whose registered agent is Cory Graham Sottek. The LLC can be served with process at 1603 Avocado Rd. Oceanside, CA 92054.

10.    Defendant Americare Medservices Inc., is an active California corporation whose registered agent is Scott Smith.  The corporation can be served with process at 1059 E. Bedmar St., Carson, CA 90746.

11.    Defendant Alert Ambulance Network, LLC is an active California LLC whose registered agent is Burleigh Wright.  The entity may be served with process at 3585 Hancock St, San Diego, CA 93110.

12.    Defendant Balboa Ambulance, Inc, is an active California corporation whose registered agent for service of process is John Olson.  The corporation may be served with process at 6483 Dwane Ave, San Diego, CA 92120.

13.    Defendant E R Ambulance, is an active California corporation whose registered agent for service of process is Rafael Silva.  The corporation may be served with process at 9640 B Mission Gorge Road # 338, Santee, CA 92071.

14. Defendant Medfleet Ambulance Service, Inc, is an active California corporation whose registered agent for service of process is Gregory L. Gibson. The corporation may be served with process at its principal place of business, 3479 Kurtz St., San Diego, CA 92110.

15. Defendant Bowers Companies, Inc. dba Bowers Ambulance, is an active California corporation whose registered agent for service of process is Raymond Iskander. The corporation may be served with process at its principal place of business, 3355 E. Spring St. # 301, Long Beach, CA 90806.

16. Defendant Care Ambulance Service, Inc., is an active California corporation whose registered agent for service of process is Rick Richardson. The corporation may be served with process at its principal place of business, 1517 W. Braden Ct., Orange, CA 92868. To distinguish between Care Ambulance of Orange County and CARE, the ambulance service owned by Mr. Carlisle, Care Ambulance (Anaheim) will be used to refer to this defendant in the complaint.

17. Defendant County Rescue, Inc. dba County Rescue Ambulance and CRA Ambulance, is an active California corporation. Its principal place of business is 2434 E. Fender Ave, # G, Fullerton, CA. Its registered agent

for service of process is Bartlett Cramwell . The corporation may be served with process at 4585 Wade Ave, Perris, CA 92571.

18.   Defendant Enova Medical Response, Inc., is an active California corporation whose registered agent for service of process is Gagik Papoyan. The corporation may be served with process at its principal place of business, 19236 Victory Blvd., Tarzana, CA 91335.

19.   Defendant Lifeline Emergency Response System, Inc., is an active California corporation whose registered agent for service of process is Heidi M. Lopez. The corporation may be served with process at its principal place of business, 242 California Court, Mission Viejo, CA 92692.

20.   Defendant Filyn Corporation dba Lynch Ambulance, is an active California corporation whose principal place of business is 2950 La Jolla Street, Anaheim, CA 92806. Its registered agent for service of process is Walt Lynch. The corporation may be served with process at 5621 Foxmills Ave., Buena Park, CA 90621.

21.   Defendant Medcoast Medservices, Inc., is an active California corporation whose registered agent for service of process is James L. Twaddell. The corporation may be served with process at 14325 Iseli Road, Santa Fe Springs, CA 90670.

22.  Defendant Trans-Aid, Inc, is an active California corporation whose registered agent for service of process is Armen Abassian.  The corporation may be served with process at its principal place of business, 1300 Gardena Ave., Glendale, CA 91204.

23.  Defendants Sottek Trippe Enterprise, LLC dba Air Care International, Medfleet Ambulance Service, Inc., E R Ambulance, Balboa Ambulance, Inc., Alert Ambulance Network LLC, Americare Medservices, Inc., San Diego Medical Services Enterprise, LLC,  Rural/Metro Corporation, Bowers Companies, Inc. dba Bowers Ambulance, Care Ambulance Service, Inc., County Rescue, Inc. dba County Rescue Ambulance and CRA Ambulance, Enova Medical Response, Inc.. Lifeline Emergency Response System, Inc.. Filyn Corporation dba Lynch Ambulance, Medcoast Medservices, Inc.,  Trans-Aid Inc., and Pacific Ambulance, Inc. are all hereinafter referred to at various times as "THE AMBULANCE DEFENDANTS."

24.  Alameda Care Center, Alamitos Belmont Rehab, Alcott Rehabilitation, Alden Terrace, Alderwood Manor, Alexandria Care Center, Alhambra Convalescent, Alhambra Medical Center, All Saints Health Care, Alliance Nursing & Rehab, Alliance Nursing Center, Alta Gardens Care Center, Amberwood Convalescent, Anaheim Buena Park Hosp, Anaheim Crest

Nursing, Anaheim General Hospital, Anaheim Healthcare, Anaheim Memorial , Anaheim Regional Med Ctr, Anaheim Terrace, Angels Nursing Center, Ararat Convalescent Hosp, Ararat Nursing Center, Arbor Glen Care Center, Arbor Hills, Arbor View Rehab, Arcadia Healthcare. Arroyo Vista, Artesia Christian Home, Astoria Nursing and Rehab, Atlantic Memorial, Autumn Hills Health Care, Aviara Healthcare, Bay Crest Care Center, Bel Toreen Villa. Bel Vista Convalescent, Bell Convalescent, Bellflower Convalescent, Bellflower Medical Center, Berkley East Convalescent, Berkley Valley Convalescent, Berkley West Convalescent, Beverly Hospital, Bixby Knolls Towers, Bonnie Brae Convalescent, Bradley Court, Brentwood Healthcare, Brier Oak on Sunset, Brier Oaks Terrace, Briercrest Nursing Center, Brierwood Terrace, Brighton Convalescent, Brighton Gardens Northridge, Brighton Gardens San Dimas, Brighton Place East, Brighton Place SD, Brighton Place SV, Broadway By The Sea, Broadway Manor, Brookfield Healthcare, Brotman Medical Center. Buena Park Nursing Center, Buena Ventura Care Center. Buena Vista Care Center, Burbank Healthcare, Burlington Convalescent, California Convalescent, California Hospital Med Ctr, California Special Care, California Healthcare, Camellia Gardens, Canyon Oaks, Capistrano Beach Ext Care, Carlsbad by the Sea, Carmel Mountain Rehab, Casa de Las Campanas,

Casa Palmera, Casitas Care Center, Castle Manor, Cedars Sinai Medical Center, Centinela Hospital, Centinela Park Convalescent, Chandler Convalescent, Chandler North Hollywood, Chapman Care Center, Chapman Medical Center, Chase Care Center, Clear View Convalescent, Cloisters of La Jolla, Cloisters of Mission Hills, Coastal Communities Hosp, College Hospital  Costa Mesa, Collingwood Manor, Community Convalescent, Cottonwood Canyon, Country Hills, Country Villa, Country Villa Arcadia, Country Villa Bay Vista, Country Villa Belmont Hgts, Country Villa Broadway, Country Villa Cheviot Garden, Country Villa East, Country Villa Glendale, Country Villa Los Feliz, Country Villa Lynwood, Country Villa Mar Vista, Country Villa Monrovia, Country Villa Monte Vista, Country Villa North, Country Villa Park Marino, Country Villa Pavillion, Country Villa Plaza, Country Villa Rehab, Country Villa Seal Beach, Country Villa Sheraton, Country Villa South, Country Villa Terrace, Country Villa University, Country Villa West Covina, Country Villa Westwood, Country Villa Wilshire, Country Villa Woodman, County Villa Health Care Center, Courtyard Care Center, Coventry Court, Covina Rehabilitation Center, Crenshaw Nursing Home, Cummings Care Center, Del Mar Convalescent, Del Rio Convalescent Center, Doctors Convalescent, Downey Care Center, Downey Community Health, Downey Regional Med Ctr, Dreiers

Nursing Center, Driftwood Healthcare, East LA Doctors Hospital, El Dorado Care Center, El Monte Care Center, El Monte Convalescent, El Rancho Vista Care Center, Elmcrest Care Center, Elms Convalescent Hospital, Ember Health Care Glendale, Ember Healthcare LA, Emerald Terrace Convalescent. Emeritus at Carlsbad, Encinitas Nursing, Escondido Care Center, Fidelity Health Care Center, Fireside Convalescent, Flagship Healthcare Center, Fountain Care Center, Fountain Gardens, Fountain Valley Hosp Euclid, Fountain Valley Hosp Warner , Fountain View Convalescent, Freedom Village Healthcare, French Park Care Center, Friendship Manor, Garden Crest Convalescent, Garden Grove Convalescent, Garden Park Care Center, Garden Plaza Convalescent, Garden View Care Center, Gardena Convalescent, Glenbrook at La Costa, Glendale Adventist Hospital, Glendale Memorial Hospital, Glenoaks Convalescent, Golden State Care Center, Good Samaritan Hospital, Gordon Lane Care Center, Grand Park Convalescent, Granite Hills, Greater El Monte Hospital, Greenfield Care Fullerton, Grossmont Hospital, Guardian Rehab Hospital, Hancock Park Convalescent, Harbor Care Center, Harbor Villa, Heritage Rehabilitation, Highland Park SNF, Hoag Memorial Hospital, Hollenbeck Palms, Hollywood Community Hosp, Hollywood Presbyterian Hosp, Holy Cross Medical Center, Huntington Beach

Hospital, Huntington Health Care, Huntington Park, Huntington Valley Health, Intercommunity Long Beach, Intercommunity Norwalk, Irvine Regional Hospital, Jacob Healthcare,  Keiro Nursing Facility, Kennedy Care Center, Kindred Healthcare Orange, Kindred Hospital  Brea, Kindred Hospital  La Mirada, Kindred Hospital  Santa Ana , Kindred Hospital LA, Kindred Hospital Westminster , Kindred Hospital San Gabriel, Kingsley Manor Care Center, Knott Avenue Care Center, La Habra Convalescent, La Jolla Nursing, La Mesa Healthcare, LA Metropolitan Med Ctr, La Palma Intercommunity, La Palma Nursing Center, La Paloma Healthcare, La Paz Paramount, Lake Forest Nursing Center, Lakewood Manor, Las Flores Convalescent, Las Villas de Carlsbad, Las Villas del Norte, Leisure Court Nursing Ctr, Leisure Glen Care Center, Lemon Grove Care, Life Care of Escondido, Life Care of Vista, Little Company of Mary, Long Beach Care Center, Long Beach Memorial Hosp, Longwood Manor, Los Alamitos Medical Center, Los Alamitos West. Los Angeles Community , Magnolia Special Care, Manor Care Health Services, Manor Care-Palm Terrace, Memorial Hospital Gardena, Mesa Verde Convalescent, Methodist Hospital Arcadia, Mid Wilshire Convalescent, Mission Hills Healthcare, Monte Vista Lodge, Montebello Care Center, Monterey Care Center, New Orange Hills, Newport Bay Hospital , Newport Nursing, Newport Sub Acute ,

Northridge Medical Center, Norwalk Meadows, Oceanview Convalescent, Olympia Medical Center, Olympic Convalescent Hosp, Orange Coast Memorial, Orange Grove Rehab, Pacific Convalescent, Pacific Haven Healthcare, Palomar Heights, Palomar Medical Center, Palomar Vista, Paradise Valley Hospital, Paramount Meadows, Park Anaheim Healthcare, Park Superior Healthcare, Park Vista at Morningside, Parkside Special Care, Parkview Healthcare Center, Parkway Hills, Pico Rivera, Placentia Linda Hospital , Pomerado Hospital, Pont Loma Convalescent, Poway Healthcare, Presbyterian Community, Promise Hospital SD, Providence St. Joseph Hosp, Ramona Nursing Home, Rancho Vista, Redwood Terrace, Remington Club, Reo Vista Healthcare, Riviera Healthcare, Rosecrans Care Center, Royal Court Health Care, Royal Oaks, Royal Palms, Royale Healthcare Center, Saddleback Memorial Laguna, Saddleback San Clemente, San Diego Healthcare, San Gabriel Convalescent, San Marino Manor, Santa Fe Convalescent, Santa Monica Health Care, Scripps Green Hospital, Scripps Memorial Encinitas, Scripps Memorial La Jolla, Scripps Mercy Hospital, Sea Cliff Healthcare Center, Serrano Convalescent, Sharp Chula Vista Med Ctr, Sharp Memorial Hospital, Sherman Oaks Hospital, Sherman Oaks Rehab, Sierra View Care Center, Silver Lake Hospital, Skyline Healthcare Center, South Coast Medical Center , South

Pasadena, Southland, Springs at Pacific Regent, St Elizabeth Healthcare, St John's Health Center, St Mary Medical Center, St. John Of God, St. Joseph Hospital – Orange, St. Jude Medical Center, St. Vincent Medical Center, Stanford Court, Sun Mar Nursing Center, Sunnyside Nursing, Sunnyview Care Center, Sunray Healthcare Center, Temple Community Hospital, Terrace View Care Center, The Chalet Health Center, Torrance Memorial Med Ctr, Tri-City Medical Center, Tustin Hospital Med Ctr, UCLA Med Center Olive View, University Care Center, Valle Vista Convalescent, Verdugo Hills Hospital, Vermont Care Center, Vernon Convalescent, Vibra Healthcare Continental, Victoria Healthcare, Victoria Special Care, Villa Elena, Villa Las Palmas, Villa Monte Vista, Villa Rancho Bernardo, Village Square Nursing, Virgil Convalescent, Vista Healthcare, Vista Knoll, Walnut Manor Care Center, West Anaheim Extended, West Anaheim Med Ctr, West Hills Healthcare, Western Convalescent Hosp, Western Medical Ctr Santa Ana, White Memorial Med Ctr, Whittier Hospital Med Ctr, Windsor Convalescent, Windsor Gardens, Windsor Gardens Anaheim, Windsor Gardens Fullerton, Windsor Gardens Golden, Windsor Gardens SD, Windsor Palms, and Woodruff Convalescent are sometimes hereinafter referred to as THE INSTITUTIONAL CO-CONSPIRATORS.

**BACKGROUND FACTS**

25.     Kelvin Carlisle is the CEO and owner of Care Medical Transportation, Inc., (CARE) operating in San Diego County. In that capacity he has competed for contracts with the defendants listed herein for the past six years.  In that capacity he became aware of a similar qui tam case, United States ex rel. Block v. American Medical Response filed in Texas which imposed liability on ambulance providers for giving kickbacks to nursing homes and hospitals for ambulance services.  He became concerned that CARE might be competing for contracts with discounts that were in violation of Medicare regulations, and promptly reformed company practices.

26.     As a result of the reform of the company practices, CARE lost scores of contracts with institutions where they had previously been providing ambulance services, and became aware of a variety of mechanisms that providers were using to obtain ambulance calls in the San Diego area.

27.     The individual AMBULANCE DEFENDANTS named in this lawsuit have engaged in a pattern and practice of soliciting nursing home and hospital business by playing on the fact that for some transports to medical facilities, or between medical facilities, hospitals and nursing homes incur the full liability to pay the ambulance provider, (known as

Medicare Part A trips) while for other trips Medicare will pay the ambulance provider (known as Medicare Part B trips).

28. For example, Pacific Ambulance will offer a hospital or a nursing home a flat rate between $150 and $160 for a Part A (facility paid) transport, and will provide the facility with "free wheelchair van" service in exchange for a contract that requires the facility to use Pacific Ambulance for all Part B transports.

29. Thus, if a nursing home or hospital, was generating sufficient Medicare business, Pacific Ambulance and its other co-defendants in this action could cut the rates on each transfer for which the facility was financially responsible down to a very low figure (sometimes as low as between $80 and $180, depending on volume) and in spite of this deep discounting, because of the Medicare volumes, still be exceptionally profitable.

30. On information and belief, discovery will show that Pacific Ambulance, and its co-defendants in this action have conducted computer-modeling on the projected and historic volumes of transports and set hospital and nursing home rates based on volumes of Medicare business.   Based on this computerized assessment, defendants

consistently set nursing home and hospital ambulance rates significantly below the rate charged to Medicare.

31.    At the same time that the INSTITUTIONAL CO-CONSPIRATORS were being charged the deeply-discounted below-market rates, the "Usual and Customary Rate" BLS Non-ER trip billed to Medicare was $795.00 plus $16.00per loaded mile.  The average reimbursement for the same Medicare run was between $244 and $320 by the time mileage was added on.  Rates for ambulance services are set by the Secretary of HHS under 42 USC § 1395l.

32.    Pacific does not charge mileage to the other INSTITUTIONAL CO-CONSPIRATORS and often times does not even bother to collect the discounted rate from the facilities pursuant to their unwritten agreements.

33.    Between January 1, 2003, and the present, the AMBULANCE DEFENDANTS, and their predecessor companies, routinely charged less than the actual cost of providing a transport to the INSTITUTIONAL CO-CONSPIRATORS named above in exchange for an exclusive contract to carry all patients out of that facility by ambulance.

34.    The net effect of this exclusive arrangement is that it allowed the AMBULANCE DEFENDANTS to capture all the Medicare revenue while

providing a kickback in the form of a 50% to 100% discount on services to the referring facility.

35. On or about February 11, 1992 the Department of Health and Human Services, Office of General Counsel, issued a letter outlining the department's position on ambulance discounting practices.

36. That letter noted that certain "safe harbor" provisions existed for ambulance discounts and noted further that "[t]he safe harbor provision addressing discounts, in accordance with the statute [42 USC § 1320a-7b(b)(3)(A)] protects discounts and other reductions in price that are 'properly disclosed' and 'appropriately reflected' in the costs or charges billed to the Medicare program."

37. The letter quoted the preamble to the discount regulations stating "[e]ven where the particular item that is being given away may result in a more effective means of delivering the supplies to the health care provider, these types of 'discounts' cause problems because they often shift costs among reimbursement systems or distort the true costs of all the items. As a result it may be difficult for the Medicare program to determine the proper reimbursement levels."

38.     The letter concluded with another quotation: "Finally, it is noted that where the discount in question does not qualify as a discount under this provision, no safe harbor protection applies."

39.     In September of 1998, David Werfel, Esq., wrote in the Ambulance Industry Journal about discounts.  This article explained that discounts had to reflect an "arms length" transaction.  It quoted an OIG Fraud Alert stating: "However, 'fair market value' must reflect an arms length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them."

40.     The kickback arrangements between THE INSTITUTIONAL CO-CONSPIRATORS and the AMBULANCE DEFENDANTS violate 42 USC § 1320a-7b(b)(2) and 42 USC § 1320a-7b(b)(1) prohibiting an individual or entity from receiving or paying any kickback, bribe, or rebate in cash or in kind to obtain referrals of patients under the Medicare program.

41.     In addition to the violation of the penal statute, the payment of these kickback and bribes violates the False Claims Act inasmuch as each request for payment under Medicare carries with it an explicit promise of truthfulness and an implicit promise that the provider has complied with all applicable billing and regulatory provisions in the statutes.

42. The AMBULANCE DEFENDANTS, in representing to private and federal health care programs that their usual and customary charges for ambulance services are in the $700 to $1,900 per trip range, while at the same time charging preferred referral sources for these same services at rates that are discounted between 50 and 100% is making representations that are inherently false and fraudulent.

43. The AMBULANCE DEFENDANTS, by billing Medicare for services that are marked up between 100% and 333% over what those same services are provided to private parties is inherently false and fraudulent.

44. Accepting, appreciating, and willingly participating in the negotiation of rates for ambulance services that are significantly below market value places the INSTITUTIONAL CO-CONSPIRATORS in the position of making false representations in their Medicare Cost Reports when they certify therein that they have complied with all Medicare regulations.

45. Federal Regulations (42 C.F.R. § 1001.701) proscribes billing Medicare, for services in excessive amounts. Billing private parties anywhere from $0 to 180 per ambulance transfer while billing Medicare $700 - $900 for the same transfer is inherently excessive.

## AMBULANCE SERVICE CONTRACTS AND OPERATIONS

46.   There are two general types of ambulance service contracts; emergency medical service contracts and non-emergency ambulance service contracts. Non-medical transport services (also discussed below) are usually included in non-emergency ambulance service contracts.

**Emergency Medical Ambulance Services**

47.   Ambulance companies contract with counties, cities, and municipalities to provide **emergency medical services ("EMS").** EMS are defined as **911 calls.** A 911 call is an immediate request for help from a location other than a hospital, e.g., site of an accident, residence, business etc. EMS, with limited exceptions (e.g., off-shore oil rigs and Disneyland), are operated by political subdivisions such as counties, cities, and municipalities and supported by the public entities tax base. Emergency transports are paid by a combination of public subsidy and third party payor sources. If the patient has health benefits, a third party payor source pays for the transport. If there is no third party payment source, the transport is provided by or at the expense of the public entity. The public entity may provide EMS with its own personnel and equipment or it may contract for emergency services with private providers such

as Rural Metro and the other ambulance company defendants. In some instances there is a "tiered" system under which the public entity provides "first responder" EMS and also contracts with ambulance providers to provide "back-up responder" EMS and support services.

48.    Under its "911 contracts," the ambulance company is paid a negotiated, fixed subsidy by the contracting public entity to assure that all 911 requests are answered and executed regardless of ability to pay. In addition, the ambulance company may bill and collect payments from third party payor sources if the patient has any health insurance benefits.  EMS provided through public entities do not cover transports from hospitals.

**Non-emergency Ambulance Services**

49.    Ambulance companies contract with hospital systems, hospitals, nursing homes, government military installations, universities, school districts, and managed care organizations (e.g., CIGNA and PacificCare) to provide non-emergency ambulance services. Facilities and organizations as a general rule do not own and operate their own ambulance services.

50.    Non-emergency ambulance services are defined as all calls that are not

emergency calls (not 911 calls). Non-emergency ambulance services include transport and stand-by services (e.g., standby at athletic or community events). Non-emergency ambulance services (with the exception of stand-by services in certain instances, e.g., serious athletic injuries) are provided to patients who require a basic level of medical supervision during transfers to and from health care facilities and residences. These services may be provided when a hospital patient requires tests or treatments available at another facility, such as MRI testing, CAT scans, or chemotherapy treatment; when a home-bound patient requires examination or treatment at a health care facility; or when a hospital patient is discharged.[1]

51.     There are two general types of non-emergency ambulance services that ambulance companies contract with facilities to provide: (1) "facility-responsible transports," also known as "contract calls," and (2) "discharge transports."

52.     A **"facility-responsible transport"** or **"contract call"** is a non-

---

[1] Non-emergency ambulance services also include critical care transport services to medically unstable patients, such as cardiac patients and neonatal patients, who require critical care while being transported between health care facilities. Critical care services differ from other non-emergency services in that the ambulance may be equipped with additional medical equipment and may also be staffed by a medical specialist to attend to the patient's special needs

emergency ambulance service transport that the facility must provide to a patient at its own expense, under the terms of the patient's health insurance coverage. Many third party payers, including government health care programs, private insurance companies, and managed care plans, pay facilities a fixed, all-inclusive amount or rate under their benefit terms that is intended to cover all services and items medically necessary to treat a patient, based on the patient's illness or disease, as opposed to paying facilities a separate amount for each service and item provided to the patient. The fixed payment is intended to provide adequate reimbursement and at the same time contain costs and deter the over-utilization of services. Under this payment methodology, a facility is financially responsible for paying all patient care services out of the fixed payment and has a financial incentive to reduce costs.

53.     The payment methodology pursuant to which Medicare pays a fixed, all-inclusive payment amount or rate that covers all costs related to services furnished to beneficiaries covered under Medicare Part A (hospital benefit), as well as certain Medicare Part B (supplementary medical benefit) services, is known as the **prospective payment system ("PPS").** The payment made by Medicare under its PPS is commonly referred to as a "PPS payment" and "Part A payment." The services and items covered by PPS payments are commonly referred to

as "PPS-covered business," "PPS-covered services," "PPS business," "PPS services," "Part A business, " and "Part A services." The patients covered under the PPS are commonly referred to as "PPS-covered patients," and "Part A patients."

54.    Examples of facility-responsible transports covered by PPS payments are as follows:

54.1.    Transports between facilities within the same system.[2] Transports from one facility to another (e.g., hospital to hospital) within the same system are facility-responsible transports. As an example, a particular service may be available at one system hospital that is not available at the other. The hospital must bear the cost of this transport out of the PPS payment.

54.2.    Round-trip transports. Transports that originate and end at the same facility are facility-responsible transports. For instance, a patient may be sent from the hospital to another provider or supplier for services or items and returned to the hospital. Specific examples include hyperbaric, dialysis, and cancer treatments.

_____

[2] Transports between hospitals that are not in the same system are distinguished from transports between hospitals within the same system. The former are considered as

55.     A **"discharge transport"** includes a non-emergency transport of a patient upon discharge from a hospital, nursing home, or other facility to a non-affiliated facility.

56.     Third-party payment sources, including government health care programs (e.g., Medicare), insurance companies, and managed care plans (e.g., health maintenance organizations), treat a discharge transport as a separately covered and reimbursable benefit under the terms of the patient's health insurance coverage if certain conditions are met. Medicare treats discharge transports as separately reimbursable Medicare Part B (supplementary medical benefit) services if they are medically necessary for the health of the patient.

57.     Payments made by Medicare for Medicare Part B (supplementary medical benefit) services that are reimbursed separately to the providers of such services are commonly referred to as "Part B payments." The services and items covered by Part B payments are commonly referred to as "Part B business," "Part B services," and "non-PPS covered services." The patients covered by Part B payments are commonly referred to as "Part B patients."

---

"discharges," and billable to third party payers, including government health care programs, as a separate benefit

58.  Pursuant to contracts with hospital systems, hospitals, nursing homes, and other health care facilities (e.g., dialysis, hyperbaric, cancer treatment), ambulance companies agree to provide all of a facility's non-emergency transport needs within stated response times for a defined geographic area on a 24 hour, 7 day a week basis. Common contract response time requirements are 30 minutes for emergency room, intensive care, and critical care patients, and 60 minutes for all other calls, including discharge transports.

59.  There is a separate charge for each one-way transport. For example, if a patient is transported from the hospital to another provider for services and returned to the hospital, two transports are charged.

60.  Requests by facilities for non-emergency transports are made by a facility's unit clerks, nurses, and, in the case of hospitals only, discharge planners, and answered by the ambulance company's **dispatch center (aka "communication center").** The dispatch center is generally staffed with two to five dispatchers, depending on the anticipated volume of transport calls. Each dispatcher has a telephone and a computer connected to a network server.

61.  Upon receiving a non-emergency transport request, the dispatcher obtains information from which the dispatcher determines whether the

request is for a facility-responsible or a discharge transport. The dispatchers are familiar with the different providers and facility origin and destination locations and can determine the type of transport from this information alone.

62.    If the request is for a facility-responsible transport, the dispatcher obtains and enters into the computer information that includes the patient's demographics, the level of services (BLS or CCT) and equipment required for the patient during transport, and the pick-up and drop-off (appointment) times and locations. The dispatcher assigns the call to an ambulance unit after obtaining the necessary information. The dispatcher does not obtain billing information for facility-responsible transports. For round trip transports, the return trip to the originating facility may or may not be arranged by the other facility, but most likely will be arranged with the same transporting provider.

63.    If the request is for a discharge transport, the dispatcher obtains billing information, in addition to the other information obtained for facility-responsible transports. The request is processed by the dispatch center the same as facility-responsible transports in all other respects.

64.   With regard to a request for a facility-responsible transport, upon arriving at a facility the attendants go to the patient's room and receive a verbal report and transfer documents from the nursing staff. The transfer documents usually consist of a copy of the patient's entire chart. The patient is taken by stretcher and placed in the ambulance by the attendants, and the attendant charged with providing the level of care appropriate to the patient rides in the back of the ambulance with the patient to the destination. If the patient requires BLS services the patient is attended by an EMT, and if the patient requires CCT services the patient is attended by a nurse and an EMT. The other attendant drives the ambulance. En route, the treating attendant monitors the patient and begins filling out a Run Ticket. When the ambulance arrives at the destination, the ambulance attendants take the patient into the facility on a stretcher. The attendants take the patient directly to the assigned room or treatment area, give a verbal report to the medical staff of the patient's condition and changes, if any, and obtain the facility's acknowledgment of receipt of the patient. The treating attendant completes the Run Ticket, but is not required to obtain or report any billing information. A copy of the Run Ticket is submitted to the facility staff and the ambulance unit goes back in service.

65.   With regard to discharge transports, the attendants must obtain and

report the billing information on the Run Ticket. The attendants obtain the billing information from the originating facility when they pick up the patient, at the same time they receive the verbal report and transfer documents from the nursing staff. The attendants' procedure for discharge transports is the same as for facility-responsible transports in all other respects.

### "Wheelchair" Transport Services

66.     In addition to ambulance services, ambulance companies provide medical transportation by wheelchair van for the physically challenged and the elderly. This service is provided by vans or coaches that contain hydraulic wheelchair lifts. The vans are staffed by a single driver. Typically the driver is not a licensed health care provider, such as an EMT or nurse. The vans are used to transport ambulatory as well as wheel chair patients. These transports are commonly referred to as **"wheelchair," "ambulette" "cabulance," or "carecab" transports.** Transportation is generally between nursing homes, hospitals and doctor offices or other health care facilities or residences. These types of transports are not covered under the Medicare program.

67.     These medical transportation services are typically included as an

added service in contracts for non-emergency ambulance services with hospital systems, hospitals, nursing homes, and other health care facilities.

## Benefit to Ambulance Companies Under Government Health Care Programs

68.   Many, if not most, of the patients who are provided non-emergency ambulance services are beneficiaries of federal and state health care programs.

69.   *Federal health care program* is defined in the Medicare fraud and abuse statute as

"(1) any plan or program that provides health benefits, whether directly, through insurance,

or otherwise, which *is* funded directly, in whole or in part, by the United States Government

or

(2) any State health care program, as defined in section 1320a-7(h) . .
. "

42 U.S.C. § 1320a-7b(f).

70.   Government health care programs include, but are not limited to,

Medicare and the Federal Employees Health Benefits Program ("FEHBP", e.g., Mail handlers and Government Employees Hospital Association), Railroad Retirement, and Federal workers' compensation insurance **("Government Health Care Programs").**

71.     Critical to the continued viability and solvency of Government Health Care Programs are the fundamental concepts that medical providers bill the payers only for medical treatments and services that are reimbursable, legitimately medically necessary and actually performed in accordance with all applicable statutes and regulations.

72.     Although there are numerous federally funded health insurance programs, the Medicare and Medi-Cal programs account for the majority of government spending in this area. Since 1965, the Medicare program has enabled elderly, disabled, and low-income patients to obtain necessary medical services from medical providers throughout the United States.

**Medicare**

73.     Medicare is a national health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney

failure.[3] Payments from the Medicare program come from the Medicare Trust Fund, which is funded through payroll deductions and additional appropriations by the United States.

74.    Medicare is divided into two parts. *Medicare Part A* means the hospital insurance program authorized under Part A of Title XVIII of the Social Security Act. Part A helps pay for care in hospitals and skilled nursing facilities and for home health and hospice care. *Medicare Part B* means the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. Part B helps pay for doctor bills and for outpatient hospital care and various other medical services not covered by Part A.

75.    The Medicare program is administered through the Center for Medicare Services, an agency of the United States Department of Health and Human Services.

76.    CMS contracts with fiscal *intermediaries* to determine and make payments for Part A and Part B benefits payable on a cost basis, and with *carriers* to determine and make payments for Part B benefits payable on a charge basis.

---

[3] Congress established the Medicare program in 1965 with the adoption of Title XVIII of the

## Methods of Payment Under Government Health Care Programs

77.     Several different methods of payment are used to reimburse providers and suppliers for services furnished to government program beneficiaries. The principal payment methods are as follows: charge basis; prospective payment; and reasonable cost basis. The applicable method is generally dependent upon provider type and service setting.

78.     Ambulance companies are generally reimbursed for medically necessary "discharge transports" on a *charge basis.* Pursuant to this method of payment, ambulance companies are paid a fixed amount for each service according to the fee schedule adopted by a particular government program.

79.     Hospitals, nursing homes, and certain other facilities are reimbursed for "facility responsible transports" through *a prospective payment system.* Pursuant to this method of payment, facilities are reimbursed a fixed amount or at a fixed rate for all services and items medically necessary to treat a patient, including

---

Social Security Act.

any "facility responsible transports," based on the diagnosis assigned to each patient upon discharge. Every patient discharged from a hospital can be uniquely classified into one of approximately 500 diagnosis-related groups ("DRGs") used by Medicare and other government programs. DRGs are patient illness categories that reflect the hospital resources required to treat the illness. Each DRG is assigned a "case weight" which represents the relative average costliness of patients in that DRG compared with the average costliness of all DRGs.

**Conditions of Reimbursement**

80.   To be eligible for payment of ambulance services under government health care programs, the ambulance supplier must comply with all applicable statutes and regulations.

81.   Generally, services must be: (i) furnished to a program beneficiary during a period of entitlement; (ii) furnished by a facility or other entity authorized by the respective government program to provide the services; and (iii) reasonable and necessary for the diagnosis or treatment of the patient.

82.   Under Medicare, the ambulance supplier must satisfy the conditions

and requirements set forth in 42 C.F.R. §§ 410.40 (Coverage of ambulance services) and 410.41 (Requirements of ambulance suppliers), which sections are incorporated herein by reference and summarized, in part, below.[4]

83.   The Medicare basic rule for coverage of ambulance services provides as follows:

"(a) Basic rules. Medicare Part B covers ambulance services if the following conditions are met:

"(1)   The supplier meets the applicable vehicle, staff, and billing and reporting requirements of §410.41 and the service meets the medical necessity and origin and destination requirements of paragraphs (d) [medical necessity requirements] and (e) [origin and destination requirements] of this section.

"(2)   Medicare Part A payment is not made directly or indirectly for the services."

42 C.F.R. § 410.40(a).

84.   The Medicare medical necessity requirements for coverage of ambulance services provide as follows:

---

[4] In 1999, § 410.40 was amended and § 410.41 was added. Prior to 1999, Medicare ambulance service limitations, including vehicle and vehicle staff requirements, were

"(d) Medical necessity requirements

"(1) General rule. Medicare covers ambulance services only if they are furnished to a beneficiary whose medical condition is such that other means of transportation would be contraindicated. For *nonemergency ambulance transportation,* the following criteria must be met to ensure that ambulance transportation is medically necessary:

(i)    The beneficiary is unable to get up from bed without assistance.

(ii)    The beneficiary is unable to ambulate.

(iii)    The beneficiary is unable to sit in a chair or wheelchair.

(2) Special rule for *nonemergency, scheduled ambulance services.* Medicare covers nonemergency, scheduled ambulance services if the ambulance supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met. The physician order must be dated no earlier than 60 days before the date the service is furnished.

(3) Special rule for *nonemergency, unscheduled ambulance services.* Medicare covers nonemergency, unscheduled ambulance services under the following circumstances:

"(i)  For a resident of a facility who is under the care of a

---

contained in 42 C.F.R. § 410.40. The 1999 changes do not affect the claims alleged in this complaint.

physician if the ambulance supplier obtains a written order from the beneficiary's attending physician, within 48 hours after the transport, certifying that the medical necessity requirements of paragraph (d)(1) of this section are met.

"(ii) For a beneficiary residing at home or in a facility who is not under the direct care of a physician. A physician certification *is* not required."

42 C.F.R. § 410.40(d). (Emphasis added).

85.   Origin and destination requirements for coverage of ambulance services

provide as follows:

(e) Origin and destination requirements. Medicare covers the following ambulance transportation:

(1) From any point of origin to the nearest hospital, CAH [critical access hospital], or SNF [skilled nursing facility] that is capable of furnishing the required level and type of care for the beneficiary's illness or injury. The hospital or CAH must have available the type of physician or physician specialist needed to treat the beneficiary's condition.

(2) From a hospital, CAH, or SNF to the beneficiary's home.

(3) From a SNF to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip.

(4) For a beneficiary who is receiving renal dialysis for treatment of ESRD, from the beneficiary's home to the nearest facility that furnishes renal dialysis, including the return trip."

42 C.F.R: § 410.40(e).

86.     Billing and reporting requirements for ambulance suppliers

provide as follows: "(c) An ambulance supplier must comply

with the following requirements:

(1) Bill for ambulance services using HCFA-designed procedure codes to describe origin and destination and indicate on claims form that the physician certification is on file.

(2) Upon a carrier's request, complete and return the ambulance supplier form designated by HCFA and provide the Medicare carrier with documentation of compliance with emergency vehicle and staff licensure and certification requirements in accordance with State and local laws.

(3) Upon a carrier's request, provide additional information and documentation as required."

42 C.F.R. § 410.41(c).

87.     Reimbursement is not permitted under government programs

unless adequate documentation exists in the beneficiary's medical

file to demonstrate the actual performance and medical necessity of the

services. If a government program pays a claim and subsequently

discovers that the medical documentation is inadequate, the program is entitled to deny the claim retroactively and obtain a refund.

## The Anti-Kickback Statute

88.   The Federal Medicare and Medi-Cal anti-kickback laws prohibit individuals and entities from knowingly and willfully soliciting, receiving, offering or paying any remuneration in order to induce business reimbursed under the Medicare or state health care programs. The types of remuneration covered specifically include kickbacks, bribes, and rebates, whether made directly or indirectly, overtly or covertly, in cash or in kind. Prohibited conduct includes remuneration intended to induce referrals of patients and remuneration intended to induce the purchasing, leasing, ordering, or arranging for any good, facility, service or item paid for by Medicare or state health care programs.

89.   The anti-kickback statute provides in pertinent part as follows:

"(1) whoever knowingly and willfully *solicits or receives any remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind

*(A) in return for referring an individual* to a person for the furnishing or arranging for the furnishing of any item or service for

which payment may be made in whole or in part under a Federal health care program, or

*(B) in return for* purchasing, leasing, *ordering, or arranging for* or recommending purchasing, leasing, or ordering any good, facility, *service* or item for which payment may be made in whole or in part under a Federal health program,

shall be guilty of a felony . . . .

"(2) whoever knowingly and willfully *offers or pays* any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind *to any person to induce such person*

*(A) to refer an individual* to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, or

(B) to purchase, lease, *order, or arrange* for or recommend purchasing, leasing, or ordering any good, facility, *service,* or item for which payment may be made in whole or in part under a federal health care program,

shall be guilty of a felony . . ." (Emphasis added).

## 42 U.S.C. § 1320a-7b(b), Illegal remunerations.

90.    Payment and other practices and arrangements that would otherwise

constitute illegal remuneration under the anti-kickback laws are treated

as exceptions, if certain statutory or regulatory conditions are met.[5]

91.    *Discounts* generally constitute remuneration under the anti-kickback laws, unless the statutory or regulatory requirements of 42 U.S.C. § 1320a-7b (b) (3) (A) and 42 C.F.R. § 1001.952 (h) are met.

92.    Excepted discounts expressly do not include a reduction in price applicable to one payer but not to- Medicare- or a state health care program. 42 C.F.R. § 1001.952(h)(3)(i.i.i).

## The defendants' fraudulent conduct

### A. Illegal discount arrangements between ambulance companies and hospital systems, hospitals, nursing homes, and other health care facilities

93.    Ambulance companies in the past and presently grant deep discounts for facility-responsible transports to hospital systems, hospitals, nursing homes, and other facilities that are in a position to refer a substantial volume of discharge transports. The discounts are granted as an inducement, as consideration, and in exchange for a facility's referral of its discharge transports, for which an ambulance

---

[5] The statutory exceptions and safe harbors are set forth at 42 U.S.C. § 1320a-7b(b)(3) and 42 C.F.R. § 1001.952, respectively.

company may separately bill and receive payment at substantially higher rates from third party payer sources, including Government Health Care Programs. An ambulance company will not grant a facility a deep discount on facility-responsible transports unless it will receive substantially all of the facility's lucrative discharge transports. The size of the discount granted to a particular facility for facility-responsible transports is typically directly proportional to the volume of the facility's discharge transport referrals. The higher the volume of referrals the deeper the discount. The amounts ambulance companies charge and collect for discharge transports from Government Health Care Programs and other third party payors subsidize the discounts the ambulance companies grant facilities for facility-responsible transports.

94.     Hospital systems, hospitals, nursing homes, and other facilities refer substantially all of their discharge transports, on an exclusive basis, to ambulance companies that will grant them deep discounts on their facility-responsible transports. The referrals are made as an inducement, as consideration, and in exchange for the discounts, which reduce a facility's operational costs and increase its bottom line. A facility will not refer substantially all of its lucrative discharge transports to a particular ambulance company unless it will receive, in

return, a deep discount on facility-responsible transports for which it is financially responsible.

95. The illegal, discount ambulance service contracts usually provide for an initial term of 1 to 5 years and contain an "evergreen" clause pursuant to which the contract automatically renews for additional periods (e.g., year to year), unless either party serves written notice of cancellation a specified number of days prior to the renewal date or the contract is terminated under another provision. Many of the contracts contain a provision allowing either party to terminate the contract "without cause" within a specified number of days by serving the other party with written notice of termination. In actual practice, facilities have treated the ambulance service contracts as "at will" contracts which they could terminate any time another company offered them better, i.e., lower priced, facility-responsible transport rates.

96. In the past, the facility ambulance service contracts expressly provided that the facility agreed to utilize the ambulance company exclusively for its transports. Current contracts typically state that the facility will use the ambulance company as its "primary" or "preferred" provider for transports, unless there is a specific request by the patient or the patient's physician for another ambulance company. Such requests are

rarely, if ever, made. In practice, the contracts continue to be exclusive arrangements by unspoken agreement.

97.    Discount contract rates are usually stated separately for BLS and CCT facility-responsible transports. Contract rates typically consist of a "base fee," plus an additional "mileage" rate. The "base fee" is a fixed amount per one-way transport, e.g., $$150 for each BLS contract call. The CCT base fee is typically higher than the BLS base fee, but is usually discounted by a much higher percentage than the BLS call. The "mileage" rate is an additional charge for each mile the patient travels on board the ambulance, e.g., $1.95/loaded mile over 39 miles. The mileage rate for CCT and BLS services is the same. In practice, facilities pay only the agreed base fees and do not pay any additional mileage charges. Mileage rate charges are purposely defined in terms of sufficiently large service areas (e.g., county) or distances (e.g., over 39 miles) for which there is no additional charge to ensure that the facility will not have to pay any mileage charges.

98.    Ambulance companies have not offered the same discounts to Government Health Care Programs for the same services rendered to patients in the same facilities. Ambulance companies have charged Medicare and other third party payor sources their full, usual and

customary rates, comprised of substantially higher base rates, plus mileage charges.

99.   The BLS Medicare allowable base fees (e.g., $244.01, San Diego 2009) and mileage rates ($6.87/loaded mile, San Diego 2009) for the geographic areas covered by the contracts during the same time periods are substantially higher than the facility contract rates. **The BLS contract rate charges are typically 50% less than the corresponding rates allowed by Medicare** .

100.   The BLS trips to emergency rooms and CCT Medicare allowable base fees (BLS ER = $390.41 CCT=$793.03) for the geographic areas covered by the contracts during the same time periods are substantially higher than the facility contract rates. **The contract rate charges for these types of trips are typically 70% less than the corresponding rates allowed by Medicare.**

101.   Approximately 80% to 90% of a facility's total monthly transports, contract and noncontract calls (but not including medical wheelchair transports), are the higher paying non-contract calls separately reimbursable to the ambulance supplier by government and private insurers. Approximately 90% of the non-contract calls are transports separately reimbursable by Medicare.

102.   The discounted BLS and CCT rates charged by an ambulance company
       to a facility for contract calls are not commercially reasonable without
       taking into account the ambulance company's expectation that it will
       receive substantially all of the facility's higher paying non-contract
       calls separately reimbursable to the ambulance supplier by
       government and private insurers.   (This argument is offset partially by
       those contracts offered by HMO's like Kaiser who make no Medicare
       referrals but command rates closer to 60% of Medicare rates.)

103.   The discounts in many instances are below the ambulance company's
       average cost per trip. The *average cost perBLS transport* in San Diego is
       and for several years has been approximately $225.00 to $235.00, or
       more, based on total expenses divided by total ambulance trips.  There
       is no significant difference between the time it takes to do contracted
       and non-contracted trips and the costs associated with them.

104.   The discounts ambulance companies have offered to facilities in a
       position to refer a high volume of discharge transports have been
       substantially higher than the discounts offered to facilities that do not
       have as much higher paying business.

105.   The ambulance companies have submitted and the facilities have
       caused to be submitted to Government Health Care Programs, including

Medicare, claims for payment of non-contract calls that were substantially in excess of the ambulance companies' actual usual charges. The charges to Government Health Care Programs substantially exceeded the amount the ambulance companies most frequently were paid by non-Federal payors.

106.   As a further inducement to facilities, ambulance service contracts usually obligate the ambulance company to provide and charge the facility discount rates for "wheel chair" transport services. The "wheel chair" transports are typically charged at or below cost. The actual direct cost of "wheel chair" transports (personnel and vehicle operation, insurance and repair costs, exclusive of indirect overhead costs) in San Diego is approximately $ 25.00. Medi-Cal , which generally pays less than any other third party payor source, pays $17 .00 plus mileage for a wheel chair transport. Wheel chair transports are not a covered service reimbursed by Medicare. Many facility contracts include "wheel chair" transport service only in exchange for exclusive ambulance business.

## PACIFIC AMBULANCE – SPECIFIC CONDUCT

107.   Pacific Ambulance is engaged in fraudulent conduct specifically in the following manner.  Pacific Ambulance's usual and customary rate for

BLS Non-emergency is $795 plus $16 per mile plus any supplies used. This is what they charged in Sept. 2008. On information and belief, Pacific's UCR is now higher. The current allowable rate by Medicare Part B for the same trip would be $244 plus $6.87 per mile with no reimbursement for supplies. This compares to the flat rate of $150 to $180 with no mileage charge for Part A trips they would charge facilities who give them Part B business.

108.   Thus assuming, for purposes of example only, that the average round-trip mileage charge is 20 miles, Medicare would allow Pacific $625.42 for the same transports that one of the facilities would pay 300.00. This means that every time Medicare pays for an ambulance round-trip from one of these facilities, it results in an overpayment to Pacific of $325.42.  This is a conservative figure when applied to the other AMBULANCE DEFENDANTS who give bigger discounts than this.

109.   Historically, the average skilled nursing facility or hospital uses Medicare Part B transport services at a rate of 1 trip per every 8 beds per month. Based upon the above example, the overcharges to Medicare in any given month by the Ambulance Defendants are as follows:

| Facility | Beds | Averge monthly trips | Amount of Overpayment |
|---|---|---|---|
| Alameda Care Center | 89 | 11 | $ 1,810.15 |
| Alamitos Belmont Rehab | 94 | 12 | $ 1,911.84 |
| Alcott Rehabilitation | 121 | 15 | $ 2,460.99 |
| Alden Terrace | 210 | 26 | $ 4,271.14 |
| Alderwood Manor | 98 | 12 | $ 1,993.20 |
| Alexandria Care Center | 177 | 22 | $ 3,599.96 |
| Alhambra Convalescent | 97 | 12 | $ 1,972.86 |
| Alhambra Medical Center | 118 | 15 | $ 2,399.97 |
| All Saints Health Care | 128 | 16 | $ 2,603.36 |
| Alliance Nursing & Rehab | 139 | 17 | $ 2,827.09 |
| Alliance Nursing Center | 59 | 7 | $ 1,199.99 |
| Alta Gardens Care Center | 129 | 16 | $ 2,623.70 |
| Amberwood Convalescent | 107 | 13 | $ 2,176.25 |
| Anaheim Beuna Park Hosp | 42 | 5 | $ 854.23 |
| Anaheim Crest Nursing | 83 | 10 | $ 1,688.12 |
| Anaheim General Hospital | 101 | 13 | $ 2,054.21 |
| Anaheim Healthcare | 250 | 31 | $ 5,084.69 |
| Anaheim Memorial | 223 | 28 | $ 4,535.54 |
| Anaheim Regional Med Ctr | 219 | 27 | $ 4,454.19 |
| Anaheim Terrace | 98 | 12 | $ 1,993.20 |
| Angels Nursing Center | 49 | 6 | $ 996.60 |

| | | | |
|---|---|---|---|
| Ararat Convalescent Hosp | 42 | 5 | $ 854.23 |
| Ararat Nursing Center | 196 | 25 | $ 3,986.40 |
| Arbor Glen Care Center | 98 | 12 | $ 1,993.20 |
| Arbor Hills | 106 | 13 | $ 2,155.91 |
| Arbor View Rehab | 144 | 18 | $ 2,928.78 |
| Arcadia Healthcare | 117 | 15 | $ 2,379.63 |
| Arroyo Vista | 53 | 7 | $ 1,077.95 |
| Artesia Christian Home | 66 | 8 | $ 1,342.36 |
| Astoria Nursing and Rehab | 218 | 27 | $ 4,433.85 |
| Atlantic Memorial | 109 | 14 | $ 2,216.92 |
| Autumn Hills Health Care | 99 | 12 | $ 2,013.54 |
| Aviara Healthcare | 120 | 15 | $ 2,440.65 |
| Bay Crest Care Center | 80 | 10 | $ 1,627.10 |
| Bel Toreen Villa | 99 | 12 | $ 2,013.54 |
| Bel Vista Convalescent | 44 | 6 | $ 894.91 |
| Bell Convalescent | 99 | 12 | $ 2,013.54 |
| Bellflower Convalescent | 59 | 7 | $ 1,199.99 |
| Bellflower Medical Center | 144 | 18 | $ 2,928.78 |
| Berkley East Convalescent | 207 | 26 | $ 4,210.12 |
| Berkley Valley Convalescent | 125 | 16 | $ 2,542.34 |
| Berkley West  Convalescent | 54 | 7 | $ 1,098.29 |
| Beverly Hospital | 212 | 27 | $ 4,311.82 |
| Bixby knolls Towers | 99 | 12 | $ 2,013.54 |

| | | | |
|---|---|---|---|
| Bonnie Brae Convalescent | 59 | 7 | $ 1,199.99 |
| Bradley Court | 56 | 7 | $ 1,138.97 |
| Brentwood Healthcare | 59 | 7 | $ 1,199.99 |
| Brier Oak on Sunset | 140 | 18 | $ 2,847.43 |
| Brier Oaks Terrace | 159 | 20 | $ 3,233.86 |
| Briercrest Nursing Center | 135 | 17 | $ 2,745.73 |
| Brierwood Terrace | 41 | 5 | $ 833.89 |
| Brighton Convalescent | 140 | 18 | $ 2,847.43 |
| Brighton Gardens Northridge | 45 | 6 | $ 915.24 |
| Brighton Gardens San Dimas | 140 | 18 | $ 2,847.43 |
| Brighton Place East | 50 | 6 | $ 1,016.94 |
| Brighton Place SD | 99 | 12 | $ 2,013.54 |
| Brighton Place SV | 75 | 9 | $ 1,525.41 |
| Broadway By The Sea | 98 | 12 | $ 1,993.20 |
| Broadway Manor | 78 | 10 | $ 1,586.42 |
| Brookfield Healthcare | 70 | 9 | $ 1,423.71 |
| Brotman Medical Center | 420 | 53 | $ 8,542.28 |
| Buena Park Nursing Center | 143 | 18 | $ 2,908.44 |
| Buena Ventura Care Center | 99 | 12 | $ 2,013.54 |
| Buena Vista Care Center | 99 | 12 | $ 2,013.54 |
| Burbank Healthcare | 188 | 24 | $ 3,823.69 |
| Burlington Convalescent | 124 | 16 | $ 2,522.01 |
| California Convalescent | 66 | 8 | $ 1,342.36 |

| | | | |
|---|---|---|---|
| California Hospital Med Ctr | 319 | 40 | $ 6,488.06 |
| California Special Care | 90 | 11 | $ 1,830.49 |
| Callifornia Healthcare | 201 | 25 | $ 4,088.09 |
| Camellia Gardens | 160 | 20 | $ 3,254.20 |
| Canyon Oaks | 186 | 23 | $ 3,783.01 |
| Capistrano Beach Ext Care | 93 | 12 | $ 1,891.50 |
| Carlsbad by the Sea | 33 | 4 | $ 671.18 |
| Carmel Mountain Rehab | 120 | 15 | $ 2,440.65 |
| Casa de Las Campanas | 99 | 12 | $ 2,013.54 |
| Casa Palmera | 95 | 12 | $ 1,932.18 |
| Casitas Care Center | 99 | 12 | $ 2,013.54 |
| Castle Manor | 99 | 12 | $ 2,013.54 |
| Cedars Sinai Medical Center | 952 | 119 | $ 19,362.49 |
| Centinela Hospital | 307 | 38 | $ 6,244.00 |
| Centinela Park Convalescent | 69 | 9 | $ 1,403.37 |
| Chandler Convalescent | 106 | 13 | $ 2,155.91 |
| Chandler North Hollywood | 201 | 25 | $ 4,088.09 |
| Chapman Care Center | 99 | 12 | $ 2,013.54 |
| Chapman Medical Center | 114 | 14 | $ 2,318.62 |
| Chase Care Center | 240 | 30 | $ 4,881.30 |
| Clear View Convalescent | 99 | 12 | $ 2,013.54 |
| Cloisters of La Jolla | 59 | 7 | $ 1,199.99 |

| Cloisters of Mission Hills | 75 | 9 | $ | 1,525.41 |
|---|---|---|---|---|
| Coastal Communities Hosp | 178 | 22 | $ | 3,620.30 |
| College Hospital  Costa Mesa | 122 | 15 | $ | 2,481.33 |
| Collingwood Manor | 99 | 12 | $ | 2,013.54 |
| Community Convalescent | 119 | 15 | $ | 2,420.31 |
| Cottonwood Canyon | 96 | 12 | $ | 1,952.52 |
| Country Hills | 305 | 38 | $ | 6,203.32 |
| Country Villa | 99 | 12 | $ | 2,013.54 |
| Country Villa Arcadia | 99 | 12 | $ | 2,013.54 |
| Country Villa Bay Vista | 70 | 9 | $ | 1,423.71 |
| Country Villa Belmont Hgts | 117 | 15 | $ | 2,379.63 |
| Country Villa Broadway | 59 | 7 | $ | 1,199.99 |
| Country Villa Cheviot Garden | 99 | 12 | $ | 2,013.54 |
| Country Villa East | 99 | 12 | $ | 2,013.54 |
| Country Villa Glendale | 48 | 6 | $ | 976.26 |
| Country Villa Los Feliz | 131 | 16 | $ | 2,664.38 |
| Country Villa Lynwood | 99 | 12 | $ | 2,013.54 |
| Country Villa Mar Vista | 68 | 9 | $ | 1,383.04 |
| Country Villa Monrovia | 95 | 12 | $ | 1,932.18 |
| Country Villa Monte Vista | 69 | 9 | $ | 1,403.37 |
| Country Villa North | 99 | 12 | $ | 2,013.54 |
| Country Villa Park Marino | 198 | 25 | $ | 4,027.07 |
| Country Villa Pavillion | 59 | 7 | $ | 1,199.99 |

| | | | |
|---|---|---|---|
| Country Villa Plaza | 141 | 18 | $ 2,867.76 |
| Country Villa Rehab | 180 | 23 | $ 3,660.98 |
| Country Villa Seal Beach | 198 | 25 | $ 4,027.07 |
| Country Villa Sheraton | 138 | 17 | $ 2,806.75 |
| Country Villa South | 87 | 11 | $ 1,769.47 |
| Country Villa Terrace | 49 | 6 | $ 996.60 |
| Country Villa University | 88 | 11 | $ 1,789.81 |
| Country Villa West Covina | 97 | 12 | $ 1,972.86 |
| Country Villa Westwood | 93 | 12 | $ 1,891.50 |
| Country Villa Wilshire | 81 | 10 | $ 1,647.44 |
| Country Villa Woodman | 99 | 12 | $ 2,013.54 |
| County Villa Health Care Center | 208 | 26 | $ 4,230.46 |
| Courtyard Care Center | 59 | 7 | $ 1,199.99 |
| Coventry Court | 97 | 12 | $ 1,972.86 |
| Covina Rehabilitation Center | 98 | 12 | $ 1,993.20 |
| Crenshaw Nursing Home | 55 | 7 | $ 1,118.63 |
| Cummings Care Center | 99 | 12 | $ 2,013.54 |
| Del Mar Convalescent | 59 | 7 | $ 1,199.99 |
| Del Rio Convalescent Center | 99 | 12 | $ 2,013.54 |
| Doctors Convalescent | 36 | 5 | $ 732.20 |
| Downey Care Center | 99 | 12 | $ 2,013.54 |
| Downey Community Health | 198 | 25 | $ 4,027.07 |
| Downey Regional Med Ctr | 199 | 25 | $ 4,047.41 |

| | | | |
|---|---|---|---|
| Dreiers Nursing Center | 116 | 15 | $ 2,359.30 |
| Driftwood Healthcare | 99 | 12 | $ 2,013.54 |
| East LA Doctors Hospital | 127 | 16 | $ 2,583.02 |
| El Dorado Care Center | 256 | 32 | $ 5,206.72 |
| El Monte Care Center | 59 | 7 | $ 1,199.99 |
| El Monte Convalescent | 99 | 12 | $ 2,013.54 |
| El Rancho Vista Care Center | 86 | 11 | $ 1,749.13 |
| Elmcrest Care Center | 96 | 12 | $ 1,952.52 |
| Elms Convalescent Hospital | 104 | 13 | $ 2,115.23 |
| Ember Health Care Glendale | 94 | 12 | $ 1,911.84 |
| Ember Healthcare LA | 59 | 7 | $ 1,199.99 |
| Emerald Terrace Convalescent | 66 | 8 | $ 1,342.36 |
| Emeritus at Carlsbad | 45 | 6 | $ 915.24 |
| Encinitas Nursing | 99 | 12 | $ 2,013.54 |
| Escondido Care Center | 180 | 23 | $ 3,660.98 |
| Fidelity Health Care Center | 90 | 11 | $ 1,830.49 |
| Fireside Convalescent | 66 | 8 | $ 1,342.36 |
| Flagship Healthcare Center | 157 | 20 | $ 3,193.18 |
| Fountain Care Center | 166 | 21 | $ 3,376.23 |
| Fountain Gardens | 149 | 19 | $ 3,030.47 |
| Fountain Valley Hosp Euclid | 293 | 37 | $ 5,959.25 |
| Fountain Valley Hosp Warner | 107 | 13 | $ 2,176.25 |
| Fountain View Convalescent | 99 | 12 | $ 2,013.54 |

| | | | |
|---|---|---|---|
| Freedom Village Healthcare | 52 | 7 | $ 1,057.62 |
| French Park Care Center | 193 | 24 | $ 3,925.38 |
| Friendship Manor | 104 | 13 | $ 2,115.23 |
| Garden Crest Convalescent | 61 | 8 | $ 1,240.66 |
| Garden Grove Convalescent | 99 | 12 | $ 2,013.54 |
| Garden Park Care Center | 124 | 16 | $ 2,522.01 |
| Garden Plaza Convalescent | 131 | 16 | $ 2,664.38 |
| Garden View Care Center | 97 | 12 | $ 1,972.86 |
| Gardena Convalescent | 74 | 9 | $ 1,505.07 |
| Glenbrook at La Costa | 70 | 9 | $ 1,423.71 |
| Glendale Adventist Hospital | 457 | 57 | $ 9,294.81 |
| Glendale Memorial Hospital | 334 | 42 | $ 6,793.14 |
| Glenoaks Convalescent | 99 | 12 | $ 2,013.54 |
| Golden State Care Center | 132 | 17 | $ 2,684.72 |
| Good Samaritan Hospital | 433 | 54 | $ 8,806.68 |
| Gordon Lane Care Center | 96 | 12 | $ 1,952.52 |
| Grand Park Convalescent | 151 | 19 | $ 3,071.15 |
| Granite Hills | 99 | 12 | $ 2,013.54 |
| Greater El Monte Hospital | 117 | 15 | $ 2,379.63 |
| Greenfield Care Fullerton | 99 | 12 | $ 2,013.54 |
| Grossmont Hospital | 481 | 60 | $ 9,782.94 |
| Guardian Rehab Hospital | 93 | 12 | $ 1,891.50 |
| Hancock Park Convalescent | 141 | 18 | $ 2,867.76 |

| | | | |
|---|---|---|---|
| Harbor Care Center | 127 | 16 | $ 2,583.02 |
| Harbor Villa | 99 | 12 | $ 2,013.54 |
| Heritage Rehabilitation | 161 | 20 | $ 3,274.54 |
| Highland Park SNF | 59 | 7 | $ 1,199.99 |
| Hoag Memorial Hospital | 498 | 62 | $ 10,128.70 |
| Hollenbeck Palms | 106 | 13 | $ 2,155.91 |
| Hollywood Community Hosp | 99 | 12 | $ 2,013.54 |
| Hollywood Presbyterian Hosp | 434 | 54 | $ 8,827.02 |
| Holy Cross Medical Center | 250 | 31 | $ 5,084.69 |
| Huntington Beach Hospital | 131 | 16 | $ 2,664.38 |
| Huntington Health Care | 99 | 12 | $ 2,013.54 |
| Huntington Park | 99 | 12 | $ 2,013.54 |
| Huntington Valley Health | 138 | 17 | $ 2,806.75 |
| Intercommunity Long Beach | 147 | 18 | $ 2,989.80 |
| Intercommunity Norwalk | 86 | 11 | $ 1,749.13 |
| Irvine Regional Hospital | 176 | 22 | $ 3,579.62 |
| Jacob Healthcare | 72 | 9 | $ 1,464.39 |
| Keiro Nursing Facility | 300 | 38 | $ 6,101.63 |
| Kennedy Care Center | 97 | 12 | $ 1,972.86 |
| Kindred Healthcare Orange | 112 | 14 | $ 2,277.94 |
| Kindred Hospital  Brea | 48 | 6 | $ 976.26 |
| Kindred Hospital  La Mirada | 118 | 15 | $ 2,399.97 |

| | | | |
|---|---|---|---|
| Kindred Hospital  Santa Ana | 54 | 7 | $ 1,098.29 |
| Kindred Hospital LA | 81 | 10 | $ 1,647.44 |
| Kindred Hospital Westminster | 109 | 14 | $ 2,216.92 |
| Kindred Hospital San Gabriel | 76 | 10 | $ 1,545.75 |
| Kingsley Manor Care Center | 51 | 6 | $ 1,037.28 |
| Knott Avenue Care Center | 99 | 12 | $ 2,013.54 |
| La Habra Convalescent | 86 | 11 | $ 1,749.13 |
| La Jolla Nursing | 161 | 20 | $ 3,274.54 |
| La Mesa Healthcare | 94 | 12 | $ 1,911.84 |
| LA Metropolitan Med Ctr | 149 | 19 | $ 3,030.47 |
| La Palma Intercommunity | 141 | 18 | $ 2,867.76 |
| La Palma Nursing Center | 72 | 9 | $ 1,464.39 |
| La Paloma Healthcare | 93 | 12 | $ 1,891.50 |
| La Paz Paramount | 173 | 22 | $ 3,518.60 |
| Lake Forest Nursing Center | 167 | 21 | $ 3,396.57 |
| Lakewood Manor | 99 | 12 | $ 2,013.54 |
| Las Flores Convalescent | 99 | 12 | $ 2,013.54 |
| Las Villas de Carlsbad | 34 | 4 | $ 691.52 |
| Las Villas del Norte | 48 | 6 | $ 976.26 |
| Leisure Court Nursing Ctr | 72 | 9 | $ 1,464.39 |
| Leisure Glen Care Center | 94 | 12 | $ 1,911.84 |
| Lemon Grove Care | 158 | 20 | $ 3,213.52 |
| Life Care of Escondido | 120 | 15 | $ 2,440.65 |

| | | | |
|---|---|---|---|
| Life Care of Vista | 176 | 22 | $ 3,579.62 |
| Little Company of Mary | 315 | 39 | $ 6,406.71 |
| Long Beach Care Center | 163 | 20 | $ 3,315.22 |
| Long Beach Memorial Hosp | 462 | 58 | $ 9,396.50 |
| Longwood Manor | 198 | 25 | $ 4,027.07 |
| Los Alamitos Medical Center | 317 | 40 | $ 6,447.38 |
| Los Alamitos West | 194 | 24 | $ 3,945.72 |
| Los Angeles Community | 130 | 16 | $ 2,644.04 |
| Magnolia Special Care | 99 | 12 | $ 2,013.54 |
| Manor Care Health Services | 149 | 19 | $ 3,030.47 |
| Manor Care-Palm Terrace | 99 | 12 | $ 2,013.54 |
| Memorial Hospital Gardena | 69 | 9 | $ 1,403.37 |
| Mesa Verde Convalescent | 80 | 10 | $ 1,627.10 |
| Methodist Hospital Arcadia | 460 | 58 | $ 9,355.83 |
| Mid Wilshire Convalescent | 59 | 7 | $ 1,199.99 |
| Mission Hills Healthcare | 98 | 12 | $ 1,993.20 |
| Monte Vista Lodge | 21 | 3 | $ 427.11 |
| Montebello Care Center | 99 | 12 | $ 2,013.54 |
| Monterey Care Center | 103 | 13 | $ 2,094.89 |
| New Orange Hills | 145 | 18 | $ 2,949.12 |
| Newport Bay Hospital | 34 | 4 | $ 691.52 |
| Newport Nursing | 59 | 7 | $ 1,199.99 |
| Newport Sub Acute | 137 | 17 | $ 2,786.41 |

| | | | |
|---|---|---|---|
| Northridge Medical Center | 420 | 53 | $ 8,542.28 |
| Norwalk Meadows | 99 | 12 | $ 2,013.54 |
| Oceanview Convalescent | 227 | 28 | $ 4,616.90 |
| Olympia Medical Center | 204 | 26 | $ 4,149.11 |
| Olympic Convalescent Hosp | 135 | 17 | $ 2,745.73 |
| Orange Coast Memorial | 224 | 28 | $ 4,555.88 |
| Orange Grove Rehab | 97 | 12 | $ 1,972.86 |
| Pacific Convalescent | 64 | 8 | $ 1,301.68 |
| Pacific Haven Healthcare | 99 | 12 | $ 2,013.54 |
| Palomar Heights | 98 | 12 | $ 1,993.20 |
| Palomar Medical Center | 420 | 53 | $ 8,542.28 |
| Palomar Vista | 74 | 9 | $ 1,505.07 |
| Paradise Valley Hospital | 301 | 38 | $ 6,121.96 |
| Paramount Meadows | 104 | 13 | $ 2,115.23 |
| Park Anaheim Healthcare | 115 | 14 | $ 2,338.96 |
| Park Superior Healthcare | 96 | 12 | $ 1,952.52 |
| Park Vista @ Morningside | 99 | 12 | $ 2,013.54 |
| Parkside Special Care | 52 | 7 | $ 1,057.62 |
| Parkview Healthcare Center | 41 | 5 | $ 833.89 |
| Parkway Hills | 60 | 8 | $ 1,220.33 |
| Pico Rivera | 99 | 12 | $ 2,013.54 |
| Placentia Linda Hospital | 114 | 14 | $ 2,318.62 |
| Pomerado Hospital | 236 | 30 | $ 4,799.95 |

| | | | |
|---|---|---|---|
| Pont Loma Convalescent | 133 | 17 | $ 2,705.05 |
| Poway Healthcare | 99 | 12 | $ 2,013.54 |
| Presbyterian Community | 188 | 24 | $ 3,823.69 |
| Promise Hospital SD | 100 | 13 | $ 2,033.88 |
| Providence St. Joseph Hosp | 71 | 9 | $ 1,444.05 |
| Ramona Nursing Home | 148 | 19 | $ 3,010.14 |
| Rancho Vista | 57 | 7 | $ 1,159.31 |
| Redwood Terrace | 59 | 7 | $ 1,199.99 |
| Remington Club | 59 | 7 | $ 1,199.99 |
| Reo Vista Healthcare | 162 | 20 | $ 3,294.88 |
| Riviera Healthcare | 154 | 19 | $ 3,132.17 |
| Rosecrans Care Center | 99 | 12 | $ 2,013.54 |
| Royal Court Health Care | 162 | 20 | $ 3,294.88 |
| Royal Oaks | 136 | 17 | $ 2,766.07 |
| Royal Palms | 140 | 18 | $ 2,847.43 |
| Royale Healthcare Center | 127 | 16 | $ 2,583.02 |
| Saddleback Memorial Laguna | 252 | 32 | $ 5,125.37 |
| Saddleback San Clemente | 219 | 27 | $ 4,454.19 |
| San Diego Healthcare | 305 | 38 | $ 6,203.32 |
| San Gabriel Convalescent | 151 | 19 | $ 3,071.15 |
| San Marino Manor | 59 | 7 | $ 1,199.99 |
| Santa Fe Convalescent | 90 | 11 | $ 1,830.49 |
| Santa Monica Health Care | 56 | 7 | $ 1,138.97 |

| | | | |
|---|---|---|---|
| Scripps Green Hospital | 173 | 22 | $ 3,518.60 |
| Scripps Memorial Encinitas | 138 | 17 | $ 2,806.75 |
| Scripps Memorial La Jolla | 370 | 46 | $ 7,525.34 |
| Scripps Mercy Hospital | 517 | 65 | $ 10,515.13 |
| Sea Cliff Healthcare Center | 123 | 15 | $ 2,501.67 |
| Serrano Convalescent | 99 | 12 | $ 2,013.54 |
| Sharp Chula Vista Med Ctr | 330 | 41 | $ 6,711.79 |
| Sharp Memorial Hospital | 490 | 61 | $ 9,965.99 |
| Sherman Oaks Hospital | 153 | 19 | $ 3,111.83 |
| Sherman Oaks Rehab | 146 | 18 | $ 2,969.46 |
| Sierra View Care Center | 98 | 12 | $ 1,993.20 |
| Silver Lake Hospital | 180 | 23 | $ 3,660.98 |
| Skyline Healthcare Center | 99 | 12 | $ 2,013.54 |
| South Coast Medical Center | 208 | 26 | $ 4,230.46 |
| South Pasadena | 156 | 20 | $ 3,172.85 |
| Southland | 120 | 15 | $ 2,440.65 |
| Springs at Pacific Regent | 59 | 7 | $ 1,199.99 |
| St Elizabeth Healthcare | 59 | 7 | $ 1,199.99 |
| St John's Health Center | 340 | 43 | $ 6,915.18 |
| St Mary Medical Center | 349 | 44 | $ 7,098.22 |
| St. John Of God | 131 | 16 | $ 2,664.38 |
| St. Joseph Hospital - Orange | 525 | 66 | $ |

| | | | 10,677.84 |
|---|---|---|---|
| St. Jude Medical Center | 349 | 44 | $ 7,098.22 |
| St. Vincent Medical Center | 409 | 51 | $ 8,318.55 |
| Stanford Court | 105 | 13 | $ 2,135.57 |
| Sun Mar Nursing Center | 69 | 9 | $ 1,403.37 |
| Sunnyside Nursing | 360 | 45 | $ 7,321.95 |
| Sunnyview Care Center | 93 | 12 | $ 1,891.50 |
| Sunray Healthcare Center | 99 | 12 | $ 2,013.54 |
| Temple Community Hospital | 178 | 22 | $ 3,620.30 |
| Terrace View Care Center | 59 | 7 | $ 1,199.99 |
| The Chalet Health Center | 90 | 11 | $ 1,830.49 |
| Torrance Memorial Med Ctr | 401 | 50 | $ 8,155.84 |
| Tri-City Medical Center | 397 | 50 | $ 8,074.48 |
| Tustin Hospital Med Ctr | 177 | 22 | $ 3,599.96 |
| UCLA Med Center Olive View | 377 | 47 | $ 7,667.71 |
| University Care Center | 87 | 11 | $ 1,769.47 |
| Valle Vista Convalescent | 58 | 7 | $ 1,179.65 |
| Verdugo Hills Hospital | 110 | 14 | $ 2,237.26 |
| Vermont Care Center | 200 | 25 | $ 4,067.75 |
| Vernon Convalescent | 99 | 12 | $ 2,013.54 |
| Vibra Healthcare Continental | 110 | 14 | $ 2,237.26 |
| Victoria Healthcare | 79 | 10 | $ 1,606.76 |
| Victoria Special Care | 120 | 15 | $ 2,440.65 |

| | | | |
|---|---|---|---|
| Villa Elena | 98 | 12 | $ 1,993.20 |
| Villa Las Palmas | 151 | 19 | $ 3,071.15 |
| Villa Monte Vista | 149 | 19 | $ 3,030.47 |
| Villa Rancho Bernardo | 299 | 37 | $ 6,081.29 |
| Village Square Nursing | 118 | 15 | $ 2,399.97 |
| Virgil Convalescent | 124 | 16 | $ 2,522.01 |
| Vista Healthcare | 187 | 23 | $ 3,803.35 |
| Vista Knoll | 119 | 15 | $ 2,420.31 |
| Walnut Manor Care Center | 99 | 12 | $ 2,013.54 |
| West Anaheim Extended | 138 | 17 | $ 2,806.75 |
| West Anaheim Med Ctr | 219 | 27 | $ 4,454.19 |
| West Hills Healthcare | 145 | 18 | $ 2,949.12 |
| Western Convalescent Hosp | 129 | 16 | $ 2,623.70 |
| Western Med Ctr Santa Ana | 280 | 35 | $ 5,694.85 |
| White Memorial Med Ctr | 353 | 44 | $ 7,179.58 |
| Whittier Hospital Med Ctr | 178 | 22 | $ 3,620.30 |
| Windsor Convalescent | 120 | 15 | $ 2,440.65 |
| Windsor Gardens | 199 | 25 | $ 4,047.41 |
| Windsor Gardens Anaheim | 154 | 19 | $ 3,132.17 |
| Windsor Gardens Fullerton | 99 | 12 | $ 2,013.54 |
| Windsor Gardens Golden | 99 | 12 | $ 2,013.54 |
| Windsor Gardens SD | 98 | 12 | $ 1,993.20 |
| Windsor Palms | 298 | 37 | $ 6,060.95 |

| Woodruff Convalescent | 140 | 18 | $      2,847.43 |
| --- | --- | --- | --- |
| | | | |
| | | Monthly Overcharges | 1,057,411.61 |
| | | Annual Overcharges | $12,688,939.32 |

110. In 2006, CARE Ambulance won the Sharp Mission Park contract with performance based criteria embedded in the contract.   CARE renegotiated the rates it was charging Sharp so that they were the same as what CARE was billing on Medicare Part B transports. Scripps Hospital System then purchased Sharp Mission Park but did not like the parity with Medicare rates and rebid the contract.  CARE bid at the Medicare rates, and Pacific bid at roughly half the Medicare rate for BLS transports (or approximately $160) and less than a third of Medicare CCT rates.  Pacific was awarded the contract.

111. A similar issue with bidding Medicare rates unfolded at the University of California San Diego, who, while not a defendant based on case law (as an entity of the state), awarded the contract it had previously given to CARE to Pacific for rates roughly half of what Medicare was allowing.

112. CARE representatives informed both UCSD and Scripps (the new owner of Sharp Mission Park) that there were inducement issues and

anti-kickback issues in paying below-market rates and awarding Pacific all their Medicare transports.

## SPECIFIC CONDUCT BY OTHER AMBULANCE DEFENDANTS

113.   **Alert Ambulance** is following essentially the same pathway developed and used by Pacific to engage in unlawful swapping in violation of the antikickback statute.

113.1.   On information and belief the firm is offering inducements to Community Convalescent of La Mesa, Arbor Hills, Brighton Place East, Brighton Place San Diego, Castle Manor, Friendship Manor, Point Loma Convalescent, Stanford Court, Magnolia Special Care, Promise Hospital, and Villa Las Palmas.

113.2.   The rates being provided to Brighton Health Alliance facilities are less than $160 for BLS trips.

113.3.   The rates being provided to Generations Healthcare are less than $150 per transport.

113.4.    These rates for facility transports are offered specifically to obtain exclusive rights to Medicare transports paying much more lucrative amounts.

114.    **Americare** is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.

114.1.    On information and belief the firm is offering inducements to Casa De Las Campanas, Casa Palmera, Escondido Care Center, Glenbrook At La Costa,  Lakewood Manor, Las Villas de Carlsbad, Las Villas Del Norte, Life Care Center Escondido, Life Care Center Vista, Mission Hills Health Care,  Remington Club, and Vista Healthcare.

114.2.    Americare is offering BLS flat rates for facility transfers of $70 per transport.

114.3.    Americare is offering CCT flat rates of $200 per transport.

114.4.    Contracts between Americare and Tri-City Hospital call for Americare to coordinate 100% of the Hospital's medical transportation.

114.5.    Americare is offering El Dorado Care Center rates of $150 for BLS transports.

114.6.    Americare is offering Remington Club rates of $155 per transport

114.7.    Americare is offering Casa de las Campanas $165 per transport.

114.8.    Americare is offering Life Care Escondido rates of $140 in exchange for all their business.

115.   Sottek Trippe Enterprise, LLC dba **Air Care International**, which specializes exclusively in CCTs, is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.  On information and belief the firm is offering inducements to Scripps Encinitas Hospital and Poway Healthcare as well as to other AMBULANCE DEFENDANTS to obtain referrals of Medicare Part B business.

115.1.    Air Care is offering Scripps Memorial Encinitas rates of $350 for CCT ambulance services and $165 for BLS runs.

115.2.    Air Care is offering Scripps Memorial La Jolla the same rates as Encinitas.

115.3.    Air Care is offering Scripps Green Hospital the same rates as Encinitas and La Jolla.

116.    **Balboa Ambulance**, also operating in Orange County and as "Aeromedovac" is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.

116.1.    It offers BLS flat rates of $70 per transport.

116.2.    It offers CCT flat rates of $200 per transport.

116.3.    It offers air base rates of $635 fixed wing plus $4.45 per air mile.

116.4.    A 2005 letter agreement between Balboa and Tri City called for it to provide a transportation coordinator to work on site coordinating all transport needs through Balboa.

116.5.    The firm is offering inducements to:

116.5.1.    Springs at Pacific Regent,

116.5.2.    Classic Residence by Hyatt

116.5.3.    Life Care Escondido

116.5.4.    El Dorado Care Center gets rates of $150, and as a result replaced Americare as their exclusive provider.

116.5.5.    Vibra Continental gave an exclusive contract to Balboa at a rate of $155 BLS and $350 CCT.

117.   **Care Anaheim Ambulance** is following the same unlawful swapping scheme as the others.  It has the following unlawful arrangements:

117.1.   Anaheim General Hospital.  Care Anaheim provides free services to Anaheim General in exchange for exclusivity on all Medicare calls.

117.2.   Anaheim Memorial Medical Center.  Care Anaheim gives them a rate of $80 per transport in exchange for exclusivity.

117.3.   Beverly Hospital gets a rate of $115 per transport in exchange for exclusivity.

117.4.   Long Beach Memorial Hospital gets rates of $115 per transport in exchange for exclusivity.

117.5.   St. Mary Medical Center gets rates of $115 per transport in exchange for exclusivity.

118.   **Medfleet Ambulance** is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.

118.1.   On information and belief the firm is offering inducements to Arroyo Vista in the form of flat rate ambulance service for facility-responsible transports of $80 per trip.  This rate is offered to Arroyo Vista in exchange for all their Medicare transports.

118.2.  Lemon Grove Nursing also receives a falt rate of $80 for facility-responsible transports in exchange for their exclusive use of Medfleet.

119.  **MedCoast Ambulance** is also providing low transport rates to induce Medicare business.  Although the specific contract rates are not known (but are subject to discovery), Artesia Christian Home is receiving low rates from MedCoast.

120.  **San Diego Medical Services and Rural Metro** are following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.  On information and belief the firms are offering inducements to Grossmont Hospital, Palomar Medical Center, Pomerado Hospital, Redwood Terrace, Sharp Health System, and Villa Monte Vista.  In addition, Rural/SDMSE has entered into contracts with discounted rates using their 911 San Diego City Contract as an incentive for health plans to use their services.  The Sharp health system (to include Sharp Chula Vista, Sharp Coronado, Sharp Grossmont, Sharp Memorial) is the largest beneficiary of these services.

121.  **Bowers Companies**, owned and operated by the same individuals as Pacific, are following essentially the same pathway developed and used

by Pacific to engage in unlawful discounting.  On information and belief the firms (Bowers and Pacific) are offering the following inducements:

121.1.    TO UCSD under a discounted contract of 9/1/2008, BLS rates of $189 per transport.  Under the same contract, CCT rates of $389 per transport.  All transports are flat rate (non-mileage) transports. Pacific also pays for an onsite coordinator to provide all the hospital's medical transportation services.  The contract rates compare to Medicare rates as set forth below:

|  | Per Contract | Medicare Rates (2009) | Discount Including Mileage | Discount as % |
|---|---|---|---|---|
| BLS Rate | $ 189.00 | $ 244.01 | $(123.71) | (39.56%) |
| CCT Rate | $ 389.00 | $ 793.03 | $(472.73) | (54.86%) |
| Mileage (10 Miles Ave) | Inclusive | $ 68.70 | $ (68.70) | (100.00%) |

121.2.    Scripps Hospital and Coastal Clinic receives rates below $165 BLS and $375 CCT.

121.3.    Fountain Valley Regional Hospitals receives free trips and low rates in exchange for all of its transports.  The precise rates are unknown but should be discerned in discovery.

121.4.    Hoag Memorial Hospital receives at least some free transports in exchange for giving Pacific all their Medicare transports.

121.5.    Cloisters of La Jolla delivers all of their patients to Pacific/Bowers, including all Medicare patients, in exchange for a low rate contract.  The precise rates are unknown but should be discerned in discovery.

121.6.    Magnolia Special Care instructs facility nurses to call Pacific for all transport needs in exchange for a low rate contract.

122.    **County Rescue** is engaging in upcoding by taking patients who should go in wheelchair vans by way of ambulance without medical necessity.

123.    **Emergency Ambulance** is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.  On information and belief the firm is offering or has offered inducements to Tri City and Placentia Linda Hospital.

123.1.    Emergency offered BLS flat rates of $120 per transport to Tri City, and CCT flat rates of $350 per transport.

123.2.    Emergency offers similar low rates to Placentia Linda Hospital, a

Tenet facility.  Emergency takes all their calls and provides them with

a low rate on anything for which the facility is responsible.

124.    **Enova Ambulance** is following essentially the same pathway

developed and used by Pacific to engage in unlawful discounting.  It

offers inducements to Olympia Medical Center and Temple Community

Hospital.

124.1.    Enova does not charge Olympia Medical Center for wheelchair

transports for which the facility would be responsible.  It thus

provides free services to induce referral of Medicare business.

124.2.    Enova  does not charge Temple Community Hospital for

wheelchair transports for which the facility would be responsible.  It

thus provides free services to induce referral of Medicare business.

124.3.    On information and belief Enova is offering similar inducements

to California Hospital Medical Center.

125.    **ER Ambulance** is engaging in direct marketing to individual health

care providers by providing direct cash or in-kind payments to

referring nurses and administrators.  On information and belief the

firm is offering these inducements at least to Country Hills and Springs at Pacific Regent.

125.1.    Country Hills employees have stated that ER Ambulance is bribing them with $50 gift certificates every time a facility gives them a call.

125.2.    At the Springs at Pacific Regent an administrator there was concerned about ER offering her nurses gift cards for trips the facility referred to them.

126.  **Lifeline Ambul**ance is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.  On information and belief the firm is offering inducements to Kindred Hospitals in the form of a flat rate of $150 for BLS transports for which the facility was responsible.  On information and belief, similar discounts are being offered to Intercommunity Care Center, Heritage Rehab, and Norwalk Meadows.

127.  **Lynch Ambulance** is following essentially the same pathway developed and used by Pacific to engage in unlawful discounting.  On information and belief the firm is offering inducements to Anaheim Crest Nursing, Greenfield Care Fullerton, Knott Avenue Care Center, Manor Care Health Services, Park Anaheim Healthcare and Saddleback

Memorail in Laguna.  On information and belief similar discounts are being offered to Buena Park Nursing, Chapman Care Center, Coastal Hospital, Coventry Court, Freedom Village, Garden Grove Convalescent, Greenfield Care Center, Harbor Villa, La Palma Nursing, Leisure Court Nursing, Mesa Verde Convalescent, Newport Sub Acute, Pacific Haven, Windsor Gardens facilities, Kindred Hospitals, Knott Avenue Care.

127.1.   At Anaheim Crest Nursing Lynch provides free wheelchair transports in exchange for all the other (Medicare) ambulance transports.

127.2.   At Greenfield Care Fullerton Lynch charges less then $25 per BLS transport for facility-responsible transports.

127.3.   At Knott Avenue Care Center Lynch provides all their facility-responsible transports in exchange for Medicare business and the facility receives a very low rate on facility-responsible transports.  The exact rate is not known.

127.4.   At Manor Care Health Services Lynch is offering $80 flat BLS rates for facility-responsible transports.  This is in exchange for all Medicare transports.

127.5.   At Park Anaheim Healthcare Lynch provides their medical transports at an $80 rate in exchange for exclusivity for Medicare patients.

127.6.    At Saddleback Memorial Laguna Lynch provides the facility with

food for their meetings such as Staff and Birthdays, in exchange for

Medicare referrals.

128.    **Trans-Aid Ambulance** is following essentially the same pathway

developed and used by Pacific to engage in unlawful discounting,

although it uses its wheelchair services to drive at least part of the

discounting arrangement.

128.1.    At Allcott Rehabilitation Trans-Aid provides the facility with

"food and goodies" in exchange for referring Medicare transports to

them.

128.2.    At Angels Nursing Center Trans-Aid buys them "extras" in

exchange for referring Medicare transports to them.

128.3.    At Arbor View Rehab Trans-Aid buys them "extras" in exchange

for referring Medicare transports to them.

128.4.    At Brookfield Healthcare Trans-Aid provides them with money

for activities such as birthday parties and nurses week.  For example,

Trans-Aid paid for four hours of Mariachi performance valued at over

$800.

128.5.    At Country Villa Broadway Trans-Aid provides them with free

wheelchair service and does not charge them for at-risk wheelchair

transports in exchange for referring Medicare transports to them.

**B.      The Wheelchair Van to Ambulance Pass-through Scheme**

129.   Wheelchair companies provide transport to and from dialysis centers

for patients undergoing dialysis.

130.   In most cases dialysis is a very taxing procedure, and clients require

the service in order to be returned safely to their homes.

131.   Wheelchair transport is usually covered under Medi-Cal, and

reimburses a provider approximately $8,000 a year for dialysis runs.

132.   In certain very limited circumstances, a patient may require transport

to the dialysis center and return by ambulance.

133.   Usually this is when there are various co-morbidities (for example, a

patient with a mechanical ventilator, a quadriplegic, a patient with a

septic condition, or similar medical problem.  The co-morbid

conditions make it impossible to transport the patient safely in a

wheelchair van.

134.   These patients are the exception, not the norm.  The vast majority of

dialysis patients do not have significant co-morbid conditions and do

not require ambulance transport.

135. Medicare, as noted earlier, has a procedure to pay for scheduled ambulance transports where the physician, based on medical necessity, has pre-authorized this transport.

136. Medicare, however, does not routinely audit transport of patients by ambulance to dialysis providers.

137. Moreover, the interpretation of the requirements by local Medicare payors has devolved down to ambulance companies merely having to show that they tried to get a prescription.  They do not have to have the signed prescription in hand before delivering the service.

138. Medicare's regulations require re-authorization of this service every sixty days.  See infra.  On information and belief, the regulation is being interpreted as a "one time authorization" requirement by the ambulance companies.

139. The reimbursement to the ambulance company for a dialysis patient transported by ambulance is in the neighborhood of $80,000 per patient per year.

140. Thus by switching a patient from van to ambulance, the net reimbursement for what should be a wheelchair service increases by $72,000 per patient per year.

141.    Thus, on information and belief, Pacific Ambulance, Bowers, Alert, and numerous other of the San Diego and Los Angeles/Orange County providers use the following methodology to obtain payments for ambulance services:

141.1.    The ambulance company identifies a patient that would like to receive ambulance transport (a one-on-one service as opposed to a group service in a wheelchair van).

141.2.    They tell the client they will request a prescription from the doctor.

141.3.    The ambulance service sends an authorization form to the medical provider, but does not send a self-addressed or business-reply envelope.

141.4.    The ambulance service sends the form by certified mail to show proof of mailing.

141.5.    The doctor's office, if it responds at all, responds by phone and denies the authorization. The ambulance company does not make any record of these phone calls and continues to provide the service.

141.6.   If audited, they can show that they requested the authorization. At the worst, they are denied going forward and pocket the reimbursement up to the point of an audit.

142.   The vast majority of these claims are never audited, and the ambulance services use these transports to cover overhead and keep their ambulances on the road generating revenue.

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(A)(1)**
**A CAUSE OF ACTION ASSERTED**
**AGAINST THE AMBULANCE DEFENDANTS**
**FOR SUBMISSION OF FALSE INVOICES AT AMOUNTS**
**HIGHER THAN USUAL AND CUSTOMARY**
(Billing for Ambulance Services)

143.   Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-142 as if fully set forth herein.

144.   In Count I defendants means THE AMBULANCE DEFENDANTS, and not the INSTITUTIONAL CO-CONSPIRATORS.

145.   Defendants jointly and severally submitted or caused others in their employ to submit claims for reimbursement to Medicare for services allegedly performed in California.

146.   The invoices and claims for reimbursement were presented to an officer or agent of the United States, specifically to Medicare Fiscal Intermediaries.

147.   The claims were false in that they purported to show that the amount charged was the "Usual and Customary" amount when in fact the usual and customary amount, if calculated on the basis of the discounts and volumes offered to other payors would be significantly less.

148. The representation of the "usual and customary" amount was a material representation in that it had a natural tendency to influence the payment of the ambulance invoices.

149. The facilities were aware that in submitting their claims for reimbursement they had to comply with all federal regulations, including the Anti-kickback Statute.

150. The Anti-kickback Statute prohibits the payment of any incentive, in cash or in kind, for referral of Medicare business.

151. The Claims were then also false in that they were made with explicit knowledge that the billing and discounting arrangements violated the Anti-Kickback statute.

152. Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

152.1.   Defendants either knew directly that the claims were false; or

152.2.   Acted in deliberate ignorance of the truth or falsity; or

152.3.   Acted in reckless disregard of the truth or falsity of the claims.

153. As a result of billing for ambulance services at an amount higher than the true "usual and customary" amounts, tens of thousands of

ambulance transfers were billed to Medicare in an amount greatly in excess of what should reasonably have been billed.

154.  Alternatively, by billing for claims submitted based on inducements offered to others for the referral of that basis, claims which should not have been paid at all were paid out of the Treasury.

155.  On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

160. The claims were also false in that the AMBULANCE DEFENDANTS knew that they had offered inducements to others in exchange for the referrals of these Medicare Patients and falsely represented on their claims that they had complied with all Medicare Regulations, and therefore the claims were made in knowing violation of the Anti-Kickback statute.

161. The representations made were material in that they had a natural tendency to influence the payment of the claims.

162. Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

162.1.   Defendants either knew directly that the claims were false; or

162.2.   Acted in deliberate ignorance of the truth or falsity; or

162.3.   Acted in reckless disregard of the truth or falsity of the claims.

163. As a result of billing for ambulance services at an amount higher than the true "usual and customary" amounts, tens of thousands of ambulance transfers were billed to Medicare, and  in an amount greatly in excess of what should reasonably have been billed.

164. As a result of billing for ambulance services for claims arising out of improper inducements in violation of the Anti-kickback Statute, tens of

thousands of ambulance transfers were billed to Medicare when explicitly not authorized under federal law.

165. On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT III
## VIOLATION OF 31 U.S.C. § 3729(A)(2)
## CREATION OF FALSE RECORDS TO SUPPORT FALSE INVOICES
(Billing for Ambulance Services)

166.    Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-165 as if fully set forth herein.

167.    In billing the Medicare programs for ambulance services as outlined in Counts I & II, the AMBULANCE DEFENDANTS jointly and severally created false records.  The records were false in the following respects:

167.1.    Billing forms showed "usual and customary" charges that were clearly in excess of the Usual and Customary Charges as those charges are defined by Medicare.

167.2.    Medicare billing forms were prepared with false certifications that the services provided had been provided in compliance with all regulatory and statutory guidelines with respect to ambulance pricing.

167.3.    The claims purported to represent compliance with all federal and state regulations and guidelines and were made knowing that the discounting and swapping arrangements violated the Anti-Kickback statute.

168. The AMBULANCE DEFENDANTS knew that the omission of the actual charges billed to the INSTITUTIONAL CO-CONSPIRATORS was material to the government's rate setting decision and chose to omit that information. The AMBULANCE DEFENDANTS and Pacific knew that the government relied upon the invoices and other false statements in its regulatory role.

169. As a result of billing using higher than usual and customary rates, and higher than "best price" rates and the creation of the false records, hundreds of thousands of ambulance trips were billed to Medicare that did not reflect the price that should have been paid.

170. On the basis of the foregoing, the Treasury of the United States of America sustained damage in an amount to be calculated at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable

provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

**COUNT IV**
**VIOLATION OF 31 U.S.C. § 3729(A)(3)**
**AGAINST ALL DEFENDANTS NAMED**
**CONSPIRACY TO SUBMIT FALSE CLAIMS**

(Ambulance Billing Practices & Hospital Billing Practices)

171.   Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-170 as if fully set forth herein.

172.   The INSTITUTIONAL CO-CONSPIRATORS and the AMBULANCE DEFENDANTS jointly and severally agreed to a plan whereby the INSTITUTIONAL CO-CONSPIRATORS, on those patients for whom they had financial responsibility, would be billed for ambulance transports at a rate that was between 15% and 20% of the average cost of an ambulance transfer billed to Medicare.

173.   The INSTITUTIONAL CO-CONSPIRATORS and the AMBULANCE DEFENDANTS further agreed that the INSTITUTIONAL CO-CONSPIRATORS would use whichever of the AMBULANCE

DEFENDANTS selected as their contracted provider for all transports from that facility to any other facility.

173.1.   Even though a contract may not have required exclusivity in print, or may even have disclaimed exclusivity in print, the actual practice was that any ambulance provider would receive all the ambulance transports from that facility, and that was in fact what happened.

174.   This agreement had, at its core, an unlawful objective which was to reduce the costs of ambulance transfers to the hospital or skilled nursing facility in exchange for the exclusive right to transport Medicare patients from the facility.

175.   The objective was unlawful because it was in explicit violation of the Anti-Kickback Statute.

176.   The AMBULANCE DEFENDANTS offered an inducement in terms of a thing of value to the INSTITUTIONAL CO-CONSPIRATORS in the form of a deep discount on facility responsible transportation, and the hospitals and skilled nursing facilities accepted this benefit.

177.   The INSTITUTIONAL CO-CONSPIRATORS then conferred a benefit on to the AMBULANCE DEFENDANTS by providing them with the exclusive right to transport Medicare Part B patients and bill Medicare

at rates significantly above what the INSTITUTIONAL CO-CONSPIRATORS were paying.

178. In this regard the INSTITUTIONAL CO-CONSPIRATORS both offered and received things of value in exchange for the referral of patients whose care would be reimbursed under Medicare.  At the same time they lowered their operating costs and passed on to Medicare the costs of the very transports for which they were responsible.

179. The AMBULANCE DEFENDANTS both offered and received things of value in exchange for the referral of patients whose care would be reimbursed under Medicare.

180. After entering into this Conspiracy and agreement, the parties took steps to conceal the nature and extent of the agreement from CMS and the Office of Program Integrity.

181. After entering into this conspiracy and agreement, the INSTITUTIONAL CO-CONSPIRATORS falsely certified on their Medicare Cost Reports, the documents which establish the rates and amounts that they will be paid for providing healthcare.  Specifically, the INSTITUTIONAL CO-CONSPIRATORS certified that they complied with all federal requirements for participation in the Medicare programs and with all

federal and state requirements for participation in the program when they were not, in fact, in compliance.

182. The AMBULANCE DEFENDANTS conspired to hide the actual costs by submitting full-cost bills for payment to the INSTITUTIONAL CO-CONSPIRATORS and allowing the INSTITUTIONAL CO-CONSPIRATORS to pay in accord with their contractual allowance an amount significantly below the UCR.

183. In the case of some AMBULANCE DEFENDANTS identified elsewhere in the complaint, providers actually provided free transports in order to induce referral of Medicare patients. Thus the defendants would submit through the US Mail false invoices to the nursing facilities with the explicit understanding that the facility would not actually pay the invoice, or would pay it at a very significant discount.

184. The INSTITUTIONAL CO-CONSPIRATORS conspired to hide the actual costs paid, and sought to conceal the nature and extent of the discounts by paying the contract rate for each transfer, or, in some cases, not paying at all.

185. The INSTITUTIONAL CO-CONSPIRATORS and the AMBULANCE DEFENDANTS and others all took acts in furtherance of the conspiracy, including but not limited to:

185.1.   Taking the actions set forth above in paragraphs 119-133.

185.2.   Falsely creating internal records that allowed them to track the accounts receivable at the lower rates than those billed on the actual invoices.

185.3.   Communicating ambulance transfer policies to staff in the INSTITUTIONAL CO-CONSPIRATORS, directing them to use only the preferred provider.

185.4.   Entering into "pay to play" agreements including requesting prizes and other things of value for employee raffles.

185.5.   The INSTITUTIONAL CO-CONSPIRATORS, in derogation of their own policies with regard to the acceptance of gratuities by staff, allowed their employees to retain and accept the benefit of gifts and gratuities paid to them in exchange for ambulance calls.

185.6.   The AMBULANCE DEFENDANTS provided transfers to the INSTITUTIONAL CO-CONSPIRATORS in amounts and at billing rates as set forth in their unlawful agreements.

186.   At the time the defendants took the acts complained of above, they did so with the intention to defraud the government.

187.  As a result of the conspiracy and the billing for ambulance services using amounts in excess of the "Best Price" and amounts in excess of the "usual and customary" amounts, as well as the creation of the false records, tens of thousands of ambulance transfers were billed to Medicare that did not reflect the true costs and were in amounts grossly in excess of what should have been charged.

188.  On the basis of the foregoing, the Treasury of the United States of America sustained damage in an amount to be determined and proved at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT V
## VIOLATION OF 31 U.S.C. § 3729(A)(1)
## A CAUSE OF ACTION ASSERTED
## AGAINST THE AMBULANCE DEFENDANTS
## FOR SUBMISSION OF FALSE INVOICES IN VIOLATION OF
## MEDICARE WHEELCHAIR/AMBULANCE TRANSPORT REGULATIONS

(Billing for Ambulance Services)

189.   Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-188 as if fully set forth herein.

190.   In Count V defendants means THE AMBULANCE DEFENDANTS.

191.   Defendants jointly and severally submitted or caused others in their employ to submit claims for reimbursement to Medicare in California.

192.   The invoices and claims for reimbursement were presented to an officer or agent of the United States, specifically to Medicare Fiscal Intermediaries.

193.   The claims were false in that they purported to show that the defendants have complied with Medicare billing regulations in providing scheduled ambulance transports for dialysis patients when the ambulance defendants knew that physicians had not authorized these transports.

194. The invoices were false in that they purported to comply with Medicare billing regulations but the ambulance providers had not, in fact, obtained a physician's authorization for ambulance transport of their dialysis patients.

195. The Claims were also false in that they were made with explicit knowledge that the patients did not have co-morbidities that made their transport by ambulance a medical necessity.

196. Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

   196.1.   Defendants either knew directly that the claims were false; or

   196.2.   Acted in deliberate ignorance of the truth or falsity; or

   196.3.   Acted in reckless disregard of the truth or falsity of the claims.

197. As a result of billing for ambulance services for dialysis patients who did not require ambulance transport to or from dialysis, tens of thousands of ambulance transfers were billed to Medicare in an amount greatly in excess of what should reasonably have been billed.

198. On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

## COUNT VI
## VIOLATION OF 31 U.S.C. § 3729(A)(1)
## A CAUSE OF ACTION ASSERTED
## AGAINST THE AMBULANCE DEFENDANTS
## FOR CREATION OF FALSE RECORDS

(Billing for Ambulance Services)

199.   Relator restates, repleads, and realleges and incorporates by reference the contents of paragraphs 1-198 as if fully set forth herein.

200.   In Count VI defendants means THE AMBULANCE DEFENDANTS.

201.   Defendants jointly and severally submitted or caused others in their employ to submit claims for reimbursement to Medicare in California.

202. The claims were supported by false records.  The run tickets and other documentation purported to be in compliance with a physician's authorization, when in fact no authorization had been received.

203. The records were false in that the medical documentation failed to show any medical necessity for ambulance transport.

204. In some cases patients were offered financial incentives to ride with specific ambulance companies.

205. The claims were therefore also false in that they were made in knowing violation of the Anti-Kickback statute.

206. The representations made in the false records were material in that they had a natural tendency to influence the payment of the claims.

207. Defendants, jointly and severally knew that the invoices submitted to Medicare were false in that:

    207.1.    Defendants either knew directly that the claims were false; or

    207.2.    Acted in deliberate ignorance of the truth or falsity; or

    207.3.    Acted in reckless disregard of the truth or falsity of the claims.

208. As a result of billing for ambulance services for patients who did not require the service, Medicare was billed in an amount greatly in excess of what should reasonably have been billed.

209. On the basis of the foregoing, the Treasury of the United States of America sustained damaged in an amount to be calculated and proved at trial.

WHEREFORE, Relator Kelvin Carlisle demands judgment against the defendants jointly and severally in the amount of three times the overcharges submitted for payment to the United States Government, for a civil penalty against the defendants each jointly and severally in an amount between Five Thousand, Five Hundred Dollars ($5,500.00) and Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729, et seq., for the maximum amount allowed to the Qui Tam Plaintiff under 31 U.S.C. § 3730(d) of the False Claims Act or any other applicable provision of law, for its court costs and reasonable attorneys fees at prevailing rates, for expenses, and for such other and further relief as this Court deems meet, just and proper.

Respectfully submitted,

Edward D. Robertson, Jr.    Mobar#27183
Brett Votava, Calif. Bar # 221707
Anthony L. DeWitt          Mobar # 41612
BARTIMUS, FRICKLETON, ROBERTSON & GORNY, P.C.
715 Swifts Highway
Jefferson City, MO  65109
(573) 659-4454
(573) 659-4460 (Fax)
aldewitt@sprintmail.com
chiprob@earthlink.net


ATTORNEYS FOR RELATORS

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues for which a jury is available.

Respectfully submitted,

Edward D. Robertson, Jr.    Mobar#27183
Brett Votava, Calif. Bar # 221707
Anthony L. DeWitt        Mobar # 41612
BARTIMUS, FRICKLETON, ROBERTSON & GORNY, P.C.
715 Swifts Highway
Jefferson City, MO  65109
(573) 659-4454
(573) 659-4460 (Fax)
aldewitt@sprintmail.com
chiprob@earthlink.net


ATTORNEYS FOR RELATORS

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on this _18_ day of _Nov.,_ 2009, a copy of the foregoing Complaint and the required disclosure statement was served on the individuals below by hand delivery to Joseph Price, Esq., and by placing the same in the United States Mail, first class postage affixed, and addressed to Eric Holder, Esq., at the address below:

Joseph Price
Assistant United States Attorney for the Southern
United States Attorney's Office
Southern District of California
101 W. Broadway
15th Floor
San Diego, CA 92101

Hon. Eric Holder, Esq.
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Ave. N.W.
Washington, DC 20210

Attorney for Relator

**FILED**

NOV 20 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America, ex rel. Kelvin Carlisle

**DEFENDANTS**
Pacific Ambulance, et al

**(b)** County of Residence of First Listed Plaintiff  San Diego County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Orange County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Bartimus Frickleton Robertson & Gorny, 715 Swifts Highway,
Jefferson City, MO 65109        573-659-4454

Attorneys (If Known)

'09 CV 2628 L       BLM

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 USC Section 3729
Brief description of cause:
An action to recover damages and civil penalties on behalf of the US arising out of false claims

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  11-18-09

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #  7526      AMOUNT $350      APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

MB 11/20/09

